Eldridge DEARING and Tommy Knoch, Defendants-Appellants,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1277S814.

Supreme Court of Indiana.

Aug. 29, 1979.

John Muller, Indianapolis, for defendants-appellants.

Theodore L. Sendak, Atty. Gen., Rollin E. Thompson, Asst. Atty. Gen., Indianapolis, for plaintiff-appellee.

PRENTICE, Justice.

Defendants (Appellants) were convicted in a non-jury trial of Commission of a Felony (Robbery) While Armed, Ind.Code § 35–12–1–1 (Burns 1975). Defendant Dearing was sentenced to fifteen (15) years imprisonment and Defendant Knoch received ten (10) years. In this direct appeal, they raise four issues:

(1) Whether there was probable cause to justify the arrest and subsequent search of the defendants.

(2) Whether a remark by the trial judge to one of the defendants was so intimidating and prejudicial that it denied the defendants a fair trial.

(3) Whether the identification of the defendants by the victim was so tainted by an allegedly suggestive show-up as to have required its suppression.

(4) Whether the trial court erred in admitting evidence obtained in a warrantless search of one defendant's personal effects following his incarceration.

The evidence most favorable to the State indicates that on the evening of May 9, 1977, the victim, Mrs. Lee Coulter, was working the night shift as a cashier at the Denison Parking Garage in downtown Indianapolis. At approximately 10:30 p. m., she left the cashier's booth to go to the ladies' room, taking with her $130.00 from the cash register as required by her employer. She put money into her handbag. As she passed through the lobby, she encountered two men sitting on a bench, the older of whom was wearing a pink T-shirt. She had a short conversation with them and then proceeded to the ladies' room. A few minutes later, as she was preparing to leave, the door was opened and the two men whom she had talked to in the lobby entered. The older man with the pink shirt was armed with a sawed-off shotgun. Upon their demand, she handed over the money belonging to the parking garage as well as $35.00 of her own. Mrs. Coulter and the robbers then discussed whether there was more money elsewhere. The lighting in the restroom was good, and the men made no attempt to conceal their features as they talked with Mrs. Coulter. They then fled.

Mrs. Coulter called the Indianapolis Police Department and Officer Rothenbush responded. She described one subject as being a "white male, 60 to 65, five four, balding, with gray hair, wearing a pinkish-red shirt, brown corduroy jacket, carrying a sawed-off shotgun." She described the other suspect as being a "white male, fifteen, five five, 145 pounds, with dark hair." These descriptions were broadcast over the radio. Lt. Duckworth was on patrol at the time and, upon hearing the descriptions, he stopped at the York Hotel which is several blocks from the garage and asked the night clerk if she had seen anyone matching the descriptions. The night clerk directed him to Room 328 and the officer called for assistance. Officer Rothenbush, Lt. Duck-

worth and an Officer Veza proceeded to Room 328 and knocked on the door. Defendant Dearing opened the door. He was wearing a reddish-pink T-shirt. The officers could also see defendant Knoch inside. They noted the marked similarities between the defendants and the descriptions given them by Mrs. Coulter. They also noticed a large amount of change on the bed. The defendants were arrested and the officers read them their rights. They searched the defendants and found $105.00 on Dearing and $20.00 in currency, some change, and five shotgun shells on Knoch. A woman's purse, which was subsequently identified by Mrs. Coulter as her's, was found on the floor at the foot of the bed. Mrs. Coulter was brought to the hotel, and she identified the defendants as the two men who had robbed her.

## ISSUE I

■ The defendants were arrested without warrants on the basis of the descriptions given by the robbery victim, Mrs. Coulter. They were searched and evidence was seized. Defendants contend that the arrests were illegal as being made without probable cause and that the evidence seized in the search incident to those arrests should have been suppressed.

The question of whether or not there is probable cause is determined by the facts and circumstances within the knowledge of the officers at the time that they made the arrests. *Sanchez v. State*, (1971) 256 Ind. 140, 142, 267 N.E.2d 374. In this case, the resolution of this issue turns upon the specificity of the descriptions and the degree to which the arrested suspects matched those descriptions. Defendants submit that the descriptions were not sufficiently specific to justify their arrests, and further state, "To hold otherwise would give Officers the authority to arrest and detain anyone in the downtown area wearing a pinkish-red T-shirt." This argument is without merit. It implies that the only factor in the officers' consideration was the color of Dearing's shirt and it ignores the fact that both defendants also matched the height, weight,

age, race, and hair descriptions broadcast over the police radio. The defendants—a short, old man in a pink T-shirt and his companion, a short teenager—were a rather distinctive pair and were in the immediate vicinity of the scene of the robbery shortly after it occurred. The descriptions from which probable cause was determined herein are far more specific than that with which the court was concerned in the case cited by defendants, *Gatlin v. United States*, (D.C. Cir. 1963) 117 U.S.App.D.C. 123, 326 F.2d 666. In that case, the subject was described as a black male wearing a trench coat.

The similarities between the defendants and the descriptions, together with their presence in the vicinity shortly after the crime was committed provided probable cause to make the arrests. The searches complained of were incidental to those arrests and, therefore, were proper.

## ISSUE II

■ The defendants argue that remarks by the trial judge to the defendant, Dearing, concerning possible perjury charges intimidated him and substantially prejudiced his case.

The prosecuting attorney was attempting to impeach the defendant with evidence of prior convictions, to which Dearing's attorney objected. In the ensuing discussion, the following dialogue occurred:

"Mr. Montgomery (Deputy Prosecutor): That is what I am attempting to elicit at this time, your Honor. Now, if the defendant chooses to deny under oath, that he has ever been convicted of any crime of dishonesty, it becomes incumbent upon the State to prove these separate offenses.

"The Court: Yeah. And, if he denies them under oath, and you can prove them, separately, then there is another crime that he might be involved in, and that is perjury, and the Court will also advise the witness that if you answer any questions under oath that are false or untrue, that you can be charged with perjury."

Defendants contend that the judge's remarks were unnecessary and inappropriate and had the effect of intimidating the defendant Dearing, thereby preventing him from testifying freely about the facts of this case. This argument is without merit. The cases cited by the defendants are ones in which the trial court made obviously biased statements against the defendant or his witness—usually in the presence of a jury. In the case at hand, the remarks appear to have been merely cautionary and need be distorted to support a claim of bias by inference or implication. Additionally, the trial was to the judge. It can hardly be contended that the judge's assessment of the witness' credibility would be affected by his own comments. The defendant's claim, however, is that the judge's comments may have prevented him from presenting additional evidence. If so, it was incumbent for him to support his claim by a disclosure of the evidence so omitted. The burden is upon the defendant to show how he was harmed.

## ISSUE III

■ At trial the defendants moved to suppress any in-court identification of them by the victim of the robbery, Mrs. Coulter, upon the grounds that her pre-trial identification of them at the "show-up" had been the product of an unnecessarily suggestive identification procedure.

The in-court identification was admissible if the State presented clear and convincing evidence of a basis for that identification independent of the on the scene "show-up" identification. *United States v. Wade*, (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Cooper v. State*, (1977) 265 Ind. 700, 359 N.E.2d 532; *Swope v. State*, (1975) 263 Ind. 148, 157, 325 N.E.2d 193. Such evidence is required to assure the trial court that the witness' in-court identification is not a product of a confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall v. Denno*, (1967) 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199; *Swope v.*

*State, supra.* The *Stovall* test looks to the totality of the circumstances and focuses attention on two different sets of facts:

"(1) The facts bearing on whether the confrontation was conducted in such a fashion as to lead the witness to make a mistaken identification, e. g., how the police asked the witness to attempt the identification, what the witness thought he was doing, the displayed attitude of the police towards the suspect, etc. (2) The facts bearing on how good a chance the witness had to observe the perpetrator of the crime such that any suggestiveness in the conduct of the confrontation could be resisted by the witness and he could make an accurate decision as to whether the man presented was the man who committed the crime. These would include the length of time the witness was in the presence of the perpetrator, the distance of the witness from him, the lighting conditions at the time, capacity for observation by the witness, opportunity to observe particular characteristics of the criminal, etc." *Dillard v. State*, (1971) 257 Ind. 282, 286–287, 274 N.E.2d 387.

In support of their argument, the defendants point out that Mrs. Coulter was taken to the York Hotel by the police, that she then had the impression that she was to view suspects in the case, and that, at the hotel, the only persons present were the defendants and the surrounding police officers. The State points out, however, that Mrs. Coulter had conversed with the unmasked robbers, both in the lobby of the parking garage and in the well-lighted restroom. She had had an ample opportunity to observe them for several minutes, during which time they made no attempt to conceal their appearances. She was taken to the hotel approximately one hour after the robbery, and she immediately recognized the two men. No evidence was introduced which indicates that the officers made any remarks suggesting that the defendants were guilty, or that the officers tried to influence her decision in any way. Mrs. Coulter stated that the defendants were not handcuffed. Furthermore, the de-

fendants closely matched the descriptions given by her. It is in the best interest of both the police and the suspect to have the witness either identify the suspect or remove the suspicion from him as soon as possible. In view of this policy and the circumstances surrounding the "show-up" identification in this case, we see no impropriety in the procedure employed. Suggestiveness, if any, was minimal and unavoidable hence not unreasonable under the circumstances.

## ISSUE IV

■ During the search of the defendants' hotel room, a key was found which Dearing said fit a storage locker at the bus station. He further stated that it contained "all he had in the world" and requested that Officer Brunt use the key to retrieve his possessions. The officer took the key to the bus station, opened the locker, and found two suitcases. He then searched the luggage and discovered eleven shotgun shells and a clip for a shotgun, whereupon he took the suitcases out of the bus station and placed them in the "police property room" at the police station. At trial, the shells and the clip were admitted into evidence over defense objections.

Defendants contend that the officer searched the suitcases without their consent, without a warrant, and without an exigency and thus violated Dearing's privacy interest in the contents of his suitcase. The State argues that it merely conducted a routine inventory search and that such a search is made of all personal belongings for the protection of those in custody and to insure the return of their property upon their release.

Our analysis of this issue begins with the case of *South Dakota v. Opperman*, (1976) 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000. The issue there before the United States Supreme Court was the propriety of an inventory of an *automobile*; however, an examination of Justice Burger's majority opinion reveals general guidelines to determine the constitutionality of any type of inventory. The Court, in finding a distinc-

tion between searches pursuant to criminal investigations and "noncriminal" inventories, noted that the making of inventories is not governed by the "probable cause" concept, nor is a warrant required. Rather, the test of the constitutionality of an inventory is whether, under all the circumstances, the intrusion was reasonable. The Court quoted approvingly from Justice Black's statement in *Coolidge v. New Hampshire*, (1971) 403 U.S. 443, 509–510, 91 S.Ct. 2022, 29 L.Ed.2d 564 (concurring and dissenting) that: "The test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts." The Court in *Opperman* then analyzed the facts of the case before it:

"The Vermillion police were indisputably engaged in a caretaking search of a lawfully impounded automobile. Cf. *United States v. Lawson*, 487 F.2d 468, 471 (CA8 1973). The inventory was conducted only after the car had been impounded for multiple parking violations. The owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings. The inventory itself was prompted by the presence in plain view of a number of valuables inside the car. As in *Cady* [*Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706], there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive.

"On this record we conclude that in following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of courts, the conduct of the police was not 'unreasonable' under the Fourth Amendment." 428 U.S. at 375–376, 96 S.Ct. at 3100, 49 L.Ed.2d at 1009.

Justice Powell's concurring opinion emphasized the necessity for balancing the interests involved:

"Resolution of this question requires a weighing of the governmental and socie-

tal interests advanced to justify such intrusions against the constitutionally protected interest of the individual citizen in the privacy of his effects. As noted in the Court's opinion, see ante, at 369, 96 S.Ct. at 3096, 49 L.Ed.2d 1005, three interests generally have been advanced in support of inventory searches: (i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody.

\* \* \* \* \* \*

"Against these interests must be weighed the citizen's interest in the privacy of the contents of his automobile." 428 U.S. at 377–378, 96 S.Ct. at 3101, 3102, 49 L.Ed.2d at 1010–1011. (Citations to authorities omitted.)

And while questioning the efficacy of inventory searches in discouraging false claims "since there remains the possibility of accompanying such claims with an assertion that an item was stolen prior to the inventory or was intentionally omitted from the police records," Justice Powell noted that the expectation of privacy in an automobile is significantly less than that associated with the home and concluded:

"As the Court's opinion emphasizes, the search here was limited to an inventory of the unoccupied automobile and was conducted strictly in accord with the regulations of the Vermillion Police Department. Upholding searches of this type provides no general license for the police to examine all the contents of such automobiles." 428 U.S. at 380, 96 S.Ct. at 3102, 49 L.Ed.2d 1011–1012.

Four dissenting justices (Marshall, Brennan, Stewart, and White) maintained that the defendant's privacy interest against governmental intrusion outweighed the legitimate government interest in securing the car and its contents.

The following year, the Supreme Court handed down its decision in the case of *United States v. Chadwick*, (1977) 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538. Although the issue before the Court was the propriety of a warrantless search of a locked footlocker, the case is not directly on point because the government did not attempt to justify its search as an inventory but relied upon other grounds. However, as pointed out by the defendant in the case at bar, the Court placed significant emphasis upon one's expectation of privacy with respect to his personal luggage. Again speaking for the majority, Justice Burger stated:

"The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile." 433 U.S. at 13, 97 S.Ct. at 2484, 53 L.Ed.2d at 549.

The jurisdictions that have considered the constitutionality of various types of inventory searches have reached differing results. *See*, Annot. 48 A.L.R.3d 537 (1973). *See also, State v. Slockbower*, (1979) 79 N.J. 1, 397 A.2d 1050 (in which the Supreme Court of New Jersey compares and contrasts the different approaches to this question).

Our research reveals but one jurisdiction which has considered the propriety of an inventory search of a suitcase—or similar item—in light of the *Chadwick* opinion. In *People v. Hamilton*, (1979) 74 Ill.2d 457, 24 Ill.Dec. 849, 386 N.E.2d 53, the Supreme Court of that state held that the trial court had erred in refusing to suppress narcotics found during an officer's inventory, of the defendant's briefcase. In reaching that conclusion the court sought to determine the significance of the expectancy of privacy aspect the *Chadwick* opinion in determining the constitutionality of inventory searches and concluded:

"Considering the validity of the alleged inventory of the defendant's briefcase,

we note . . . that we intimate no judgment as to the propriety of inventorying personal luggage given sufficient reasons, such as suspicion that there might be explosives inside. However, under the facts presented here, testing the reason for the inventory by the threefold test of *Opperman* and *Clark* [*People v. Clark*, 65 Ill.2d 169, 2 Ill.Dec. 578, 357 N.E.2d 798], there exists no justification for the intrusion into the defendant's briefcase. The Supreme Court in *Chadwick*, as noted above, stated that a person's expectation of privacy is substantially greater in personal luggage than in an automobile. It is apparent in this case that the defendant had an expectation of privacy in the contents of his briefcase, and to the best of his ability he sought to safeguard this privacy. The briefcase was locked and the key was kept on his person. Although he was injured in the accident, he took the briefcase with him to the hospital, and it was kept near his bed in the emergency room. The briefcase posed no threat to the police; it could have been protected from loss or theft while in police custody by placing it in a locked locker or storage room, and the officer himself could have been protected against a later claim of theft by locking the briefcase and leaving the key at the hospital along with the defendant's other personal belongings and by sealing the briefcase with tape and initialing it or by sealing it in some other suitable manner in the presence of the nurse. We can find no proper governmental purpose served by and no reasonable justification for the warrantless intrusion into the defendant's briefcase in which he obviously had a substantial expectation of privacy." 24 Ill.Dec. at 854, 855, 386 N.E.2d at 58–59.

It is apparent from an examination of these cases that a balancing of the respective interests is required.

In the case at bar, Officer Brunt testified that he had no reason to believe that there was contraband in the suitcases, that he retrieved them from the bus station pursuant only to Defendant Dearing's request,

and that he opened them and conducted an inventory only because it was normal departmental policy that he do so. We emphasize the fact that the officer was requested to retrieve the suitcases by a man whom the officer had probable cause to believe had just committed a felony using a dangerous weapon—a sawed-off shotgun. This is significant for two reasons: first, because the officer was entitled to be somewhat wary of the contents of the suitcases under these circumstances, and secondly, because the defendant could have no reasonable expectation of privacy under the circumstances. Having solicited the police to take custody of the bags, he voluntarily subjected them to normal and reasonable custodial procedures. The officer stated several times that he was required to conduct the search due to "normal property room" policy.

We agree with the statement of the United States Court of Appeals for the First Circuit in its review of the *Chadwick* case, 532 F.2d 773, 783–84, as follows:

"* * * [A]n inventory may be initiated and carried on upon a less formal basis than a criminal search and will be upheld so long as it serves a proper governmental purpose and does not amount to an excessive intrusion."

Under the circumstances of this case the inventory of the suitcases was lawful.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER and PIVARNIK, JJ., concur.

HUNTER, J., dissents with opinion.

HUNTER, Justice, dissenting.

I respectfully dissent. I part with the majority only as to Issue IV: whether the trial court erred in refusing to suppress evidence in a search of defendant's suitcases.

The Court gives substantial weight to the United States Supreme Court's approval of an automobile search in *South Dakota v. Opperman*, (1976) 428 U.S. 364, 96 S.Ct.

3092, 49 L.Ed.2d 1000. While the court emphasized the reasonableness standard for searches and seizures under the Fourth Amendment to the United States Constitution (and, I might add, the same holds true for Article I, § 11 of the Indiana Constitution), the *Opperman* case must be viewed in light of the fact that courts have consistently sustained police intrusions into automobiles in lawful police custody. Chief Justice Burger pointed out that:

> "the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." 428 U.S. at 367, 96 S.Ct. at 3096, 49 L.Ed.2d at 1004.

He also noted the low expectation of privacy associated with automobiles because of the public nature of auto travel.

Automobiles aside, it is still the law that warrantless searches are *per se* unreasonable unless they fit into one of the narrow judicially defined exceptions. *Coolidge v. New Hampshire,* (1971) 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.

> "In determining the reasonableness of warrantless searches, the central requirement is to examine the totality of the circumstances in light of established fourth amendment principles to determine if the rights which those principles embody have been violated." *United States v. Sink,* (5th Cir. 1978) 586 F.2d 1041, 1047.

Among the exigent circumstances to be considered are the state interests advanced in support of inventory searches as set forth in the majority opinion. Against these interests a reviewing court must weigh the citizen's interest in the contents of the container searched. J. Powell concurring in *South Dakota v. Opperman, supra.* This balancing, however, must still be conducted with an eye toward the general rule outlined in *Coolidge v. New Hampshire, supra.*

> "The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconven-ience to be somehow 'weighed' against the claims of police efficiency. . . . If it is to be a true guide to constitutional police action, rather than just a pious phrase, then '[t]he exceptions cannot be enthroned into the rule.'" 403 U.S. at 481, 91 S.Ct. at 2046, 29 L.Ed.2d at 592.

And the exceptions must be confined to their appropriate scope. *Ibid.*

In the case at bar the police opened defendant's suitcases in a so-called "inventory search." The majority gives a just representation of cases in which courts have established that a greater expectation of privacy attends pieces of personal luggage. *United States v. Chadwick,* (1977) 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538; *People v. Hamilton,* (1979) 74 Ill.2d 457, 24 Ill.Dec. 849, 386 N.E.2d 53. I would add *United States v. Neumann,* (8th Cir. 1978) 585 F.2d 355; *United States v. Stevie,* (8th Cir. 1978) 582 F.2d 1175; *United States v. Berry,* (7th Cir. 1977) 560 F.2d 861, and especially *Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235.

In the *Sanders* case, the Supreme Court upheld the Arkansas Supreme Court's reversal of a trial court conviction because of a warrantless search of a suitcase seized from a taxi. Justice Powell delivered the opinion of the Court saying:

> "The only question, therefore, is whether the police, rather than immediately searching the suitcase without a warrant, should have taken it, along with respondent, to the police station and there obtained a warrant for the search. A lawful search of luggage generally may be performed only pursuant to a warrant. . . . [L]uggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." —— U.S. at ——, 99 S.Ct. at 2592, 61 L.Ed.2d at 243–4.

Chief Justice Burger, in a concurring opinion, was equally emphatic.

> "Whether arrested in a hotel lobby, an airport, a railroad terminal, or on a public street as here, the owner has the right to expect that the contents of his luggage will not, without his consent, be exposed

on demand of the police. . . . The warrant requirement is not so onerous as to command suspension of Fourth Amendment guarantees once the receptacle involved is securely in the control of the police, as it was here after Sanders' arrest." —— U.S. at ——, 99 S.Ct. at ——, 61 L.Ed.2d at 247.

In light of the recognized expectation of privacy, particularly as sanctioned in *Sanders*, I am of the opinion that the majority has erred in balancing the interests of defendant and the interests of the state. That inventories are standard police procedures does not in and of itself justify the search of defendant's suitcases. Police procedures are not necessarily well known to the public and, therefore, defendant's request to the police officer to secure his belongings no more diminished defendant's expectation of privacy than would handing the suitcases over to a bus station attendant. Besides, whether the instant case involves "normal and reasonable custodial procedures" or "normal property room policy" is open to question. The inventory search was not conducted in the property room at all, but in the Indianapolis bus station, hardly a "normal" procedure.

The majority suggests that the nature of defendant's crime entitled the officer to be somewhat "wary" of the contents of the suitcases. The meaning of this reference is not clear. Was the officer "wary" in that he believed the suitcases contained evidence? If so, this fact might provide probable cause sufficient to obtain a warrant, but would not eliminate the need for obtaining a warrant. Was the officer "wary" in that he believed the police were in some danger because of the presence of the suitcases? I find no support for this proposition in the record.

Clearly, the warrant requirement is the rule and not the exception. *Coolidge v. New Hampshire, supra.* Therefore, the burden of showing exigent circumstances should properly rest upon the state. I do not find that the state has carried this burden, especially in light of the well established expectation of privacy in personal luggage.

I would reverse the judgment of the trial court and remand for a new trial.