728 A.2d 279 (1999)
321 N.J. Super. 96
STATE of New Jersey, Plaintiff-Respondent,
v.
Israel PADILLA, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Edward Feliciano, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 9, 1999.
Decided May 7, 1999.
*280 Ivelisse Torres, Public Defender, for defendants-appellants (Linda Mehling, Assistant Deputy Public Defender, of counsel and on the brief for Israel Padilla; Cecelia Urban, Assistant Deputy Public Defender, of counsel and on the brief for Edward Feliciano).
Wayne J. Forrest, Somerset County Prosecutor, for plaintiff-respondent (Marina S. Peck, Assistant Prosecutor, of counsel and on the brief).
Before Judges PRESSLER, KLEINER, and STEINBERG.
The opinion of the court was delivered by
KLEINER, J.A.D.
Both defendants separately filed motions to suppress evidence seized; these two motions were consolidated and denied by the trial judge. Thereafter, defendant Israel Padilla entered a plea of guilty to each count of a five-count indictment and defendant Edward Feliciano entered a plea of guilty to count three of that same Somerset County indictment, but as amended prior to the entry of his plea. Each defendant separately appeals the denial of his motion to suppress. We conclude that the portion of the trial judge's decision denying defendants' motions to suppress evidence seized in plain view was correct. Thus defendant Padilla's convictions relating to evidence seized in plain view are affirmed. However, we conclude that all evidence seized during an inventory of defendants' personal property should have been suppressed. We therefore reverse Padilla's *281 conviction on counts one and two of Somerset County Indictment No. 97-01-0030. We remand to the trial court to correct Padilla's judgment of conviction.[1] Feliciano's conviction is reversed as the evidence seized supportive of the amended third count of the indictment to which Feliciano entered his plea should have been suppressed. See South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.E2d. 1000 (1976); State v. Mangold, 82 N.J. 575, 414 A.2d 1312 (1980).

I
Defendant Padilla entered pleas of guilty to third-degree possession of a controlled dangerous substance, heroin (N.J.S.A. 2C:35-10(a)(1)) (count one); third-degree possession of a controlled dangerous substance, cocaine (N.J.S.A. 2C:35-10(a)(1)) (count two); third-degree possession of a handgun without having first obtained a permit to carry (N.J.S.A. 2C:30-5(b), and N.J.S.A. 2C:58-4) (count three); third-degree possession of stolen property (N.J.S.A. 2C:20-7) (count four); and second-degree possession of a handgun by a convicted felon (N.J.S.A. 2C:39-7(b)) (count five). The trial judge sentenced Padilla to nine years of imprisonment on count five. He also imposed concurrent terms of four years of imprisonment on counts three and four. In addition, counts one and two were merged with each other and defendant was sentenced to a term of four years of imprisonment to run consecutively to the sentence imposed on count five. The appropriate monetary penalties and assessments, and driver's license revocation were also imposed.[2]
Defendant Edward Feliciano[3] entered a plea of guilty to count three of the indictment as it was amended, charging him with third-degree possession of a controlled dangerous substance, heroin (N.J.S.A. 2C:35-10(a)(1)). The judge sentenced Feliciano to five years of imprisonment with two years to be served without parole. The appropriate monetary penalties and assessments, and driver's license revocation were also imposed.
In Padilla's appeal, he raises the following issues:
POINT I SINCE THE POLICE HAD NO LAWFUL AUTHORITY TO ENTER THE DEFENDANTS' MOTEL ROOM, THE TRIAL COURT ERRED IN UPHOLDING THE SEIZURE OF THE CONTRABAND FOUND THEREIN. U.S. CONST. AMENDS. IV, XIV; N.J. CONST. (1947), ART. I, PAR. 7.
A. There Was No Informed Consent Permitting the Police to Enter Defendants' Motel Room.
B. There Were No Exigent Circumstances Justifying the Police Entry into the Motel Room.
POINT II BECAUSE THE INVENTORY SEARCH OF DEFENDANTS' BAGS WAS A PRETEXT AND THE POLICE FAILED TO PROVIDE DEFENDANTS WITH AN ALTERNATIVE MEANS OF PROTECTING THEIR PROPERTY, THE CONTRABAND FOUND THEREIN SHOULD *282 HAVE BEEN SUPPRESSED. U.S. CONST. AMENDS. IV, XIV; N.J. CONST. (1947), ART. I, PAR. 7.
POINT III THE IMPOSITION OF AN AGGREGATE SENTENCE OF THIRTEEN YEARS IS MANIFESTLY EXCESSIVE.[4]
On appeal, Feliciano raises the following issues:
POINT I THE EVIDENCE SEIZED IN THE WARRANTLESS SEARCH AND SEIZURE OF DEFENDANTS' MOTEL ROOM WAS NOT ADMISSIBLE UNDER THE PLAIN VIEW EXCEPTION BECAUSE THE POLICE WERE NOT LAWFULLY IN THE MOTEL ROOM WHEN THEY OBSERVED THE EVIDENCE.
A. The Police Did Not Obtain Informed Consent to Enter Defendants' Motel Room.
B. The Police Did Not Have Grounds to Enter the Motel Room to Frisk the Occupants.
POINT II BECAUSE THE INVENTORY SEARCH OF DEFENDANT'S BAGS WAS A PRETEXT AND THE POLICE FAILED TO PROVIDE DEFENDANTS WITH AN ALTERNATIVE MEANS OF PROTECTING THEIR PROPERTY, THE CONTRABAND FOUND THEREIN SHOULD HAVE BEEN SUPPRESSED. U.S. CONST. AMENDS. IV, XIV; N.J. CONST. (1947), ART. I, PAR. 7.

II
We will briefly review the evidence presented at the suppression hearing.
On August 31, 1996, the dispatcher of the Green Brook Police Department received an anonymous telephone call advising him that two Hispanic males and one Hispanic female had been observed entering room 107 of the Ivory Tower Motel in Green Brook. The caller described the taller of the two males as wearing a lot of jewelry and carrying a handgun. As a result of the tip, Patrolman Samuel Caramela and Detective Hans Case decided to "check it out." They were joined by Officer Thomas Fisher. Caramela and Fisher were in uniform. Case was wearing civilian attire.
As the three officers approached the motel room, Fisher saw a Hispanic man whom he later identified as Padilla pull back the curtain and look out of the window from inside the room. He told the other officers what he had observed. Pursuant to established safety precautions for officers responding to information about the presence of a gun, each officer drew his service weapon, and each held their weapon at his side. According to Caramela, with Fisher on his right side, he knocked on the motel room door. Case was behind Caramela. Caramela heard movement and muffled sounds of voices in the room. However, he could not discern what was being said. He knocked again and heard a female voice from inside the room saying "[O]kay, I'm coming." Caramela said the door was unlocked and opened by a female, later identified as seventeen-year-old A.D. Caramela identified himself and asked if the officers could enter. According to Caramela and Case, A.D. said, "okay" or "yes" and opened the door wider; Fisher did not hear A.D. say anything before or as she opened the door. As A.D. opened the door, Caramela leaned his head forward to observe the room. He observed Padilla sitting on a chair. All three officers entered the room. No one objected. Caramela asked if anyone had a gun. He received no response.
Case, who was making visual observations to make sure there were no weapons within the immediate reach of the occupants, directed the other officers' attention to various items he had observed. He observed a marijuana cigarette, a razor, and rolling papers on a dresser, and a bottle labeled "lactose" containing white powder on a table. There were several overnight bags and large plastic bags containing clothes on the floor in different places around the room. On top of one bag was another clear plastic bag containing a large amount of what appeared to be cash. However, since the color of the *283 currency was odd, Case lifted the bag apparently intending to inspect it because he suspected the cash to be counterfeit.[5] Underneath the bag was a bag of ammunition.
Caramela observed the handle and hammer of what appeared to be a gun and clothes protruding from a bag on the floor next to the dresser. He picked up the gun and saw that it was loaded and the hammer was cocked, so he removed the ammunition. Defendants were arrested.
According to Caramela, as they were leaving the motel, Padilla asked, "[W]hat's going to happen to my stuff?" Caramela and Case transported defendants to headquarters. Because a decision had been made to seek a search warrant to search the various bags in the motel room, Fisher remained behind at the motel.
Upon returning to police headquarters, Caramela contacted an Assistant Somerset County Prosecutor and requested an application for a search warrant. Shortly thereafter the Assistant Prosecutor advised Caramela that the request was denied due to "insufficient evidence."
Thereafter, at police headquarters, Caramela asked all three defendants "what they wanted to [have] done with their belongings." Caramela explained the reason for his question to each defendant as follows:
Q. When you asked the Defendants, did you ask all three or what?
A. Yes.

...
Q. And why is that?
A. Because the motel won't hold on to anything. They'll just throw it in the garbage if you're out of the room, especially if you're caught there and taken in by the police, they throw your stuff away.[6]
Q. And that's based on your experience with this particular motel? A. That's correct.
Q. [A]nd if you recall, who specifically said what?
A. All three of them were very concerned about the belongings. They wanted their belongings to be taken in.
Q. Did they specifically ask for their belongings?
A. Yes.
Q. All three of them did?
A. Before we even left the motel, the first question I was asked was, what's going to happen to my stuff?
Q. And who asked you that?
A. Padilla.
Q. And you indicated that you asked all three of them if they wanted the property, and all three indicated yes. Did you communicate this to anyone?
A. I communicated to Detective Case. I believe he was also standing there, and at that point, he decided to go back to the motel to help Patrolman Fisher get the stuff and bring it back to headquarters.
Q. And when you say the stuff, are you referring to these plastic bags and overnight bags that you observed in the room?
A. Right.
According to Caramela, when Fisher and Case returned to police headquarters, defendants' possessions were brought into the dispatch area. Fisher and another officer immediately began to go through the items in each bag. According to the officers, this was done to identify which items belonged to each arrestee, because all the property could not be sent to the jail when defendants were transferred there. According to the officers, the Somerset County Jail only accepts personal belongings that will fit into a small safe deposit box. According to Caramela, the Green Brook Police Department's policy was that in any case in which personal property is to remain at police headquarters it must be listed on a property form to protect the police department from claims of lost property. *284 When multiple persons are arrested they are each asked to identify their belongings so they can be separated.
The officers found ten glassine packets containing what was later determined to be heroin in a bag that appeared to belong to A.D. Feliciano was sitting nearby when the packets were discovered and told the officers the drugs belonged to him.
The officers also found a folded dollar bill and a glassine packet inside a date book in the pants pocket of a pair of jeans removed from one bag. The dollar bill contained cocaine and the glassine packet contained heroin. Padilla told the police that the jeans and the date book belonged to him.
At the suppression hearing, A.D. testified for the defendants. She said she heard banging on the door and opened it to see who was there and the first officer pushed her aside and entered, followed by two other officers. She said they neither explained their purpose nor asked for permission to enter. On direct examination she said they had their guns out and began searching the bags. However, on cross-examination she said they had their guns pointed at her.

III
In denying the motions to suppress, the judge resolved the credibility issues in favor of the State. He found the officers credible, and specifically found A.D.'s testimony not worthy of belief. The judge found that A.D.'s testimony was incredible because it was inconsistent with her testimony at her juvenile hearing, and that she was motivated by a desire to help defendants who were her friends. Moreover, the judge said "her credibility as a witness was destroyed by the prosecutor's cross-examination." He therefore concluded that the officers knocked on the motel room door, identified themselves, and at their request were permitted into the room by A.D., implicitly rejecting A.D.'s contention that the officers pushed her aside and entered with guns drawn. Those findings could reasonably have been reached on sufficient credible evidence in the record, considering the proofs as a whole. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). Moreover, due deference must be given to the judge's assessment of credibility since he heard the case, saw and observed the witnesses, heard them testify, and had the best opportunity to assess their credibility. Gallo v. Gallo, 66 N.J.Super. 1, 5, 168 A.2d 228 (App.Div.1961). Deference must be given for the feel he acquired for the case which we do not enjoy. State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999). Accordingly, we accept his factual determinations.

A.
We first address defendants' contentions that the clear plastic container, marijuana cigarette, razor blade, rolling papers, counterfeit money, ammunition, and gun seized from the motel room should be suppressed. We disagree. The police initially went to the motel, not to search but rather to investigate the anonymous call suggesting that three people had entered the motel room with a gun. Although the unverified facts as described by the caller to the police were insufficient to support the issue of a search warrant, the police had the right, if not the obligation, to proceed to the scene in order to investigate the report that a person with a gun was in the motel room. See State v. Stanton, 265 N.J.Super. 383, 386, 627 A.2d 674 (App.Div.1993); see also State in the Interest of C.B., 315 N.J.Super. 567, 576, 719 A.2d 206 (App.Div.1998) (holding police have the right, if not the duty, to investigate an anonymous tip about a man with a gun). Indeed, our Supreme Court has emphasized the need for a realistic State approach to the dangers presented by the modern proliferation of hand guns. State in the Interest of H.B., 75 N.J. 243, 245, 381 A.2d 759 (1977). As part of the investigation the officers had the right to knock on the door and identify themselves for the purpose of continuing their investigation and making reasonable inquiries. Moreover, we see nothing unreasonable about their request for permission to enter the room, particularly in light of the fact that when A.D. opened the door, Caramela saw Padilla, who fit the description of the man with the handgun previously provided by the anonymous caller. The fact that the officers had their guns drawn but at their side is of no consequence. The caller reported *285 a person with a gun; consequently, the officers had the right to draw their handguns.
We reject defendants' contentions that A.D. did not validly consent to the entry by the officers into the room since the officers did not advise her of a right to refuse to consent. Defendants' reliance upon State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975), is misplaced. There, our Supreme Court held that if the State seeks to rely on consent as the basis for a warrantless search, it has the burden of demonstrating knowledge on the part of the person involved that he or she had the right to refuse to consent. Id. at 354, 346 A.2d 66. Here, the officers did not seek consent to search. They merely sought permission to enter to continue their investigation. Accordingly, we find Johnson to be inapposite as to those items observed in plain view in the motel room.
Additionally, once inside the room, the officers did not conduct a search. They merely made visual observations as they continued their inquiry. In light of the information received by the caller, the officers acted reasonably in making visual observations to assure themselves that no weapons were present or that none of the occupants reached for a weapon. In the course of those visual observations they discovered the items previously described, including the gun. Those items were properly seized under the plain view exception to the search warrant requirement.
Due to the judicial preference for a search warrant, a warrantless search is presumptively invalid and the State bears the burden of bringing the search within one of the exceptions to the search warrant requirement. See State v. Hill, 115 N.J. 169, 173, 557 A.2d 322 (1989) (discussing eleven recognized exceptions to the requirement that law enforcement officers obtain a warrant before searching or seizing an item or a person); see also State v. Welsh, 84 N.J. 346, 352, 419 A.2d 1123 (1980); State v. Patino, 83 N.J. 1, 7, 414 A.2d 1327 (1980). Here the State seeks to justify the search under the plain view exception. In order for the seizure of an item observed in plain view to be constitutional, the State must satisfy a three-prong test: (1) the officer must be legally in a position to view the evidence; (2) the discovery of the evidence must be inadvertent;[7] and (3) the officer must have probable cause to associate the property with criminal activity. See State v. Bruzzese, 94 N.J. 210, 236-37, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984); State v. Damplias, 282 N.J.Super. 471, 477-78, 660 A.2d 570 (App.Div.1995). We have already concluded that the first prong of the plain view exception has been satisfied since we determined that the officers were lawfully in the viewing area in light of the fact that A.D. permitted their entry. We also conclude that the discovery was inadvertent and therefore the second prong has been satisfied. While the police had a reason to investigate the report that someone in the room had a gun, they did not know its precise location let alone that it would be in plain view. The purpose of the inadvertence requirement is to prevent the police from engaging in planned warrantless searches where they know in advance the location of certain evidence and intend to seize it, relying on the "plain view" exception as a pretext. See id. at 478-79, 660 A.2d 570. Here, the officers were not aware of the specific location of the gun and clearly did not enter the premises in order to rely on the plain view exception as a pretext. Their purpose in entering the room was to perform their duty and investigate the tip. Their responsibility to investigate the tip was increased once Caramela observed Padilla who fit the description of the man with the gun. Finally, the third prong was satisfied since clearly the officers had probable cause to associate the items seized in plain view with criminal activity.

B.
We next consider defendants' contentions that the trial judge erred in not suppressing *286 the evidence seized at the police station. The judge concluded that the search was a valid inventory search and was not conducted as a pretext in order to indiscriminately search for evidence, but was conducted pursuant to departmental policy to inventory property of an arrestee that is brought to the police station. We agree with defendants and conclude that all items seized from the overnight and plastic bags brought to the police station should have been suppressed.
In South Dakota v. Opperman, 428 U.S. 364, 375-76, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000, 1009 (1976), the United States Supreme Court concluded that a police inventory of property is valid when it is part of routine police practice and is not conducted as a pretext for an indiscriminate search. These inventory procedures serve a three-fold purpose. They protect inventoried property while in police custody; protect police and other bailees from false property claims; and safeguard the police from potential danger. Ibid.
In State v. Mangold, 82 N.J. 575, 414 A.2d 1312 (1980), the Court, in considering the inventory search of the contents of an impounded van, concluded that, despite the propriety of a routine police procedure which requires the inventory of seized personalty, that the inventory will be deemed "fatally flawed by the failure of the police to discuss the disposition of the van's contents with its owner, [particularly where] the defendants were present and physically capable of making arrangements for the safekeeping of their belongings." Id. at 585-586, 414 A.2d 1312.
The Court explained:
If in fact the principle justifications for an inventory are to protect the property in the vehicle and to shield the authorities from false claims relating to those items, it would seem only reasonable to consult with the owner or temporary custodian of the vehicle when he is present at the time of the search.

[Id. at 586, 414 A.2d 1312.]
It seems abundantly clear that if the contents of an impounded van may not be subject to an inventory search where the owner is present to make alternative disposition of the personalty, that the personal property of an arrestee may not be searched under the pretext of an inventory search within the ambit of Opperman, supra, without first affording the arrestee the opportunity to consent to the search or the opportunity to make other arrangements for the disposition of the personal property. We also note that in Johnson, supra, 68 N.J. 349, 346 A.2d 66, the Supreme Court instructs that:
[U]nder [the New Jersey Constitution of 1947, Art. I. par. 7] the validity of a consent to search, even in a non-custodial situation, must be measured in terms of waiver; i.e., where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent.

[Id. at 353-54, 346 A.2d 66.]
The search of defendants' personal property was not incident to defendants' arrest. See State v. Bradley, 291 N.J.Super. 501, 508, 677 A.2d 1129 (App.Div.1996). The police must have concluded that a search warrant was necessary as they hesitated to search the motel room when defendants were first arrested under the guise that the search would be lawful as an incident to arrest or under the guise that there was an exigent need for an immediate search, and thus proceeded to contact an assistant prosecutor requesting a search warrant.
The search of defendants' personalty in this instance is particularly abhorrent to the principles which protect individual liberties "`even though the governmental purpose be legitimate and substantial,'" Mangold, supra, 82 N.J. at 587, 414 A.2d 1312 (quoting Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960)), as this search immediately ensued following notification to the police officers that a judge had denied the application for a search warrant. It is noteworthy that the police never specifically requested permission of any arrestee to search the bags that had been brought from the motel to police headquarters. The motion judge's conclusion that the inventory search was permissible *287 and was not conducted as a pretext in order to indiscriminately search for evidence was clearly wrong and as such we need not give deference to his conclusion. Johnson, supra, 42 N.J. at 162, 199 A.2d 809. Defendants were clearly entitled to receive a request for consent to search their personal property and were clearly entitled to be given a reasonable opportunity to arrange for the disposition of their personal property prior to the inventory. State v. Mangold, supra, 82 N.J. at 585-86, 414 A.2d 1312. All evidence seized from the overnight and plastic bags brought to the police station should have been suppressed. Any plea of guilt entered by either defendant predicated upon his possession of items seized from those bags must be vacated and the convictions relating to those guilty pleas must be reversed.
Affirmed in part; reversed in part.
STEINBERG, J.A.D., concurring in part; dissenting in part.
I agree with the majority's conclusion that the portion of the trial judge's decision denying defendants' motions to suppress evidence seized in plain view was correct and therefore join in that portion of the opinion. I also agree with the conclusions reached in footnote 1 of the majority opinion that a remand of Padilla's sentence is necessary due to the failure of the judge to set forth reasons for the imposition of consecutive sentences. However, I dissent from that portion of the opinion concluding that the evidence seized at the police station must be suppressed. I would affirm the convictions.
The motion judge after hearing testimony concluded that the search conducted at the police station was a valid inventory search and was not conducted as a pretext in order to indiscriminately search for evidence. He concluded that the search was conducted pursuant to departmental policy to inventory property of an arrestee which is brought to the police station. The majority concludes that since the search immediately took place following notification to the police officers that a judge had denied the application for a search warrant, the motion judge's determination that the inventory search was permissible was clearly wrong. I disagree. I believe those findings could reasonably have been reached on sufficient credible evidence considering the proofs as a whole. See State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). An appellate tribunal may only intervene if it is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction. Ibid. I cannot reach that conclusion. At police headquarters officer Caramela testified that he asked all three suspects "what they wanted to be done with their belongings because the motel won't hold on to anything. They'll just throw it in the garbage if you're out of the room, especially if you're caught there and taken in by the police, they throw your stuff away". He said all three were very concerned about their belongings and each asked that his or her belongings be brought to the police station. He communicated that fact to Officer Case and Case went back to the motel to help Officer Fisher bring defendants' belongings back to the station.
The bags were brought into the dispatch area. Fisher and another officer began to go through the items in the bag. According to the officers this was done to identify which items belonged to which defendant, because not all the property could be sent to the jail when defendants were transferred there. According to the officers the Somerset County Jail only accepts personal belongings that will fit into a small safe deposit-type box. According to Caramela the Green Brook police department's policy was that in any case in which personal property is to remain at police headquarters it must be listed on a property form to protect the police department from claims of lost property. When multiple persons are arrested they are each asked to identify their belongings so they can be separated. Having found that testimony credible I believe there was sufficient evidence in the record to support the conclusion of the trial judge. We must defer to the trial court's credibility findings that are often influenced by matters such as observations of the character and demeanor of the witnesses and common human experience that is not transmitted by a cold record. State v. Locurto, 157 N.J. 463, 474, 724 A.2d *288 234 (1999). Indeed, common sense and logic lead to the inescapable conclusion that a police department would want to insulate itself from potential claims of liability by performing an inventory upon property about to come into its possession from an arrestee and further performing that inventory in the presence of the arrestee in order to avoid a subsequent liability claim.
In South Dakota v. Opperman, 428 U.S. 364, 375-76, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000, 1009 (1976), the United States Supreme Court concluded that a police inventory of property can be valid where it is part of routine police practice and is not conducted as a pretext for an indiscriminate search. These inventory procedures serve a three-fold purpose: (1) they protect inventoried property while in police custody; (2) they protect police and other bailees from false property claims; and, (3) they safeguard the police from potential danger. Ibid. However, our Supreme Court has held that if a vehicle is lawfully impounded and its owner or permissive user is present, that person must be given the option of either consenting to an inventory or making his own arrangements for the safe-keeping of the property contained in the vehicle. State v. Mangold, 82 N.J. 575, 587, 414 A.2d 1312 (1980). Absent consent or alternative security provisions, an inventory may not be undertaken. Relying on Mangold, supra, the majority agrees with defendant's contention that if the contents of an impounded vehicle may not be subject to an inventory search where the owner is present to make arrangements for the alternative disposition of their property, likewise the personal property of an arrestee may not be searched as part of an inventory process without first affording the arrestee the opportunity to consent to the search or the opportunity to make other arrangements for the disposition of his property. I respectfully disagree.
Initially, for the reasons I have previously discussed I believe the majority has improperly concluded that the search was a pretext for an indiscriminate search rather than a legitimate inventory search. I believe the majority has improperly substituted its judgment for that of the trial judge in concluding that since the items were brought to the police station and searched after a request for a search warrant had been denied necessarily leads to the conclusion that the search was a pretext. After all, the police testified that the bags were brought to the station at the defendant's request. The judge found that testimony to be credible. There is adequate evidence to support that conclusion.
Moreover, I disagree with the majority's conclusion that under Mangold, supra, defendants were clearly entitled to receive a request for consent to search their personal property or be given a reasonable opportunity to arrange for the disposition of their property prior to the inventory. I believe Mangold, supra, is inapposite. This is not a case where the police seized or impounded defendants' belongings upon arrest. Defendants were free to make other arrangements to have their belongings picked up at the motel. It was at defendants' request that the police accommodated them and brought their belongings to the police station. While defendants may have had a "Hobson's choice" to either lose their property altogether or have it placed under police control, it was they who made the decision not to lose their property and have it brought back to the station. Once brought back to the station the police had the right to inventory the contents for the reasons set forth in Opperman, supra. It is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station incident to booking and jailing the suspect. Illinois v. Lafayette, 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, 69 (1983). At the police station it is perfectly proper to allow the police to inventory property possessed by a person about to be jailed in order to deter false claims by the person under arrest, to inhibit theft or careless handling of property taken from the arrested person, or to search for dangerous instrumentalities that the arrested person could use to harm himself or others. Id. 462 U.S. at 646, 103 S.Ct. at 2609, 77 L.Ed.2d at 71. In addition, allowing inspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity. Ibid. See also Abel v. *289 United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).
In Abel, supra, defendant was placed under administrative arrest by the Immigration and Naturalization Service for possible deportation. The arresting officers permitted him to take any belongings he wished to his initial place of detention. The United States Supreme Court upheld the search of the belongings he brought with him, observing that there was no significant difference when the property could have been searched at the time of his arrest as incidental to it, and a search that took place at his initial place of detention of the belongings he brought with him. See also State v. Paturzzio, 292 N.J.Super. 542, 550, 679 A.2d 199 (App.Div. 1996) (upholding inventory search of satchel brought by arrestee to police station); State v. Gelvin, 318 N.W.2d 302 (N.D.), cert. denied, 459 U.S. 987, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982) (upholding inventory search of wallet of person brought to police station for detoxification); Dearing v. Indiana, 271 Ind. 432, 393 N.E.2d 167 (1979) (upholding inventory search of defendant's personal effects after defendant had solicited police to take custody of them); Delatte v. Florida, 384 So.2d 245 (Fla.App.1980) (police have the right and duty to search the travel bag of a person taken into custody pursuant to routine procedure to accomplish the objective of safeguarding the jail considering the possibility that a weapon might be located in the bag).
While it is true that the police could have afforded defendants the opportunity to either consent to the search or make other arrangements for the disposition of their property, I do not believe the Constitution so requires. The issue is not what could have been done but, rather, whether the Constitution requires such steps. It is neither our function nor our right to write a manual on administering routine, neutral procedures at the police station. Rather, our role is to assure against constitutional violations. See Illinois v. Lafayette, supra, 462 U.S. at 647, 103 S.Ct. at 2610, 77 L.Ed.2d at 72. Again, this is not a case where the police initially appropriated defendants property, took it to the police station, and conducted an inventory search. I emphasize that in this case the police brought the property to the police station to accommodate defendants at their request. For these reasons I believe the evidence was properly seized and would affirm defendants' convictions but remand for resentencing of Padilla.[1]
NOTES
[1] Because of our colleague's dissent, we add the following comment as to defendant Padilla's sentence. Defendant Padilla contends that his aggregate thirteen-year custodial sentence was manifestly excessive. We agree with defendant that the judge failed to set forth reasons for the imposition of consecutive sentences. When consecutive sentences are imposed, the judge must separately state in his sentencing decision the reasons for the imposition of either consecutive or concurrent sentences. See State v. Yarbough, 100 N.J. 627, 643, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986); State v. Miller, 108 N.J. 112, 122, 527 A.2d 1362 (1987). A statement of reasons, including reasons for the imposition of consecutive sentences, is a necessary prerequisite for adequate appellate review. See State v. Miller, supra, 108 N.J. at 122, 527 A.2d 1362. Were we to have affirmed defendant's conviction, we would have vacated the sentence imposed upon Padilla and remanded for resentencing, as we would have been unable to determine on this record whether the imposition of consecutive sentences was a valid exercise of discretion.
[2] Padilla also entered pleas of guilty to counts one and two of a municipal complaint and was sentenced to two concurrent six-month terms in the county jail, to run concurrently with the State prison sentences imposed.
[3] When originally arrested, Feliciano identified himself as Julio Velez. The indictment as originally returned by the Somerset County Grand Jury referred to defendant Feliciano in the alternative utilizing the alias Julio Velez.
[4] Our decision to reverse Padilla's convictions on counts one and two of the indictment renders moot defendant's contention that the aggregate sentence imposed was manifestly excessive.
[5] The money was turned over to the United States Secret Service.
[6] Although not raised by defendants, we note that defendants were apparently registered guests at the motel. We presume defendants' possessions would not have been discarded by the motel until after checkout time the following morning even if the motel followed the policy as believed by Caramela.
[7] The United States Supreme Court has eliminated the requirement of inadvertence. See Horton v. California, 496 U.S. 128, 130, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112, 118-19 (1990). We need not decide in this appeal whether the inadvertence requirement is no longer an essential element of a plain view search under Article I, Par. 7 of the New Jersey Constitution because we are satisfied that the inadvertence requirement has been met.
[1] Looking for identification during the booking process, Caramelo went through Feliciano's wallet and found a glassine packet with white powder, later identified as heroin. Feliciano did not plead guilty to possession of the heroin found in his wallet and its seizure is not before us. However, I note that an inventory search of personal effects of an arrestee at a police station is constitutionally permissible. See State v. Paturzzio, supra, 292 N.J.Super. at 550, 679 A.2d 199; State v. Jackson, 268 N.J.Super. 194, 205 n. 5, 632 A.2d 1285 (Law Div.1993).