# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2252-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL RAMIREZ,

    Defendant-Appellant.

_____

Argued November 20, 2024 – Decided December 24, 2024

Before Judges Mayer, DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 14-03-0137.

Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Selletti, Public Defender, attorney; Lauren S. Michaels, of counsel and on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

Defendant Michael Ramirez appeals after a jury convicted him of aggravated sexual assault and other sex offenses. In the alternative, defendant challenges the sentence imposed after his convictions.

Defendant and others who worked at a gentleman's club assaulted a co-worker, S.J. (Sara).[1] Defendant and co-defendant Trystal Lozada were tried together. Other co-defendants had separate trials or pleaded guilty. We affirm as to defendant's convictions. As to the sentence imposed, we remand for the judge to provide a more fulsome analysis of the overall fairness of the sentence under State v. Torres, 246 N.J. 246 (2021), and a reassessment of the Sex Crime Victim Treatment Fund (SCVTF) penalty.

The facts leading to defendant's convictions are summarized in State v. Lozada, No. A-3211-20 (App. Div. June 12, 2023). We need not repeat them here. We recite only those facts pertinent to defendant's issues on appeal based on the motion record and trial testimony.

---

[1] We use a pseudonym when referring to the victim. R. 1:38-3(c)(12).

A-2252-20

Events of November 4 and 5, 2012

Brian and Luis Guzman[2] owned the gentlemen's club where Sara was assaulted. Defendant managed the club along with Fernando Vaquero. Sara and Lozada were dancers at the club. On the night of the sexual assaults, Brian was celebrating his birthday. He offered the dancers shots and showered them with dollar bills while they performed after the club closed for the night. At trial, Sara testified Luis had a video camera and videotaped the party. The video showed Sara consuming several shots of tequila. After drinking the tequila shots, Sara testified Vaquero offered her a "mixed drink or something."

After Sara drank the beverage, she felt numb and dizzy. As a result, she sat down to "compose [her]self before [she] had to get home." After dressing in her street clothes, Sara again sat down because she felt the room "spinning." Sara planned to call a taxi to return home, as her young sons were in the care of a sitter. However, Sara was so disoriented she could not use her cell phone to call a taxi. She then "blacked out."

The next thing Sara recalled was being sexually assaulted by Brian in one of the bedrooms in an apartment above the club. She remembered Lozada and

---

[2] Because they share the same last name, we refer to the brothers by their first names. No disrespect is intended.

A-2252-20

another man, who she later learned was Miguel De La Cruz, "peeking in" the bedroom as she was being assaulted.

Sara pushed Brian away. She retrieved her clothes, dressed, entered the apartment's living area, and yelled at De La Cruz. Upon hearing Sara yell, defendant appeared from a different bedroom and put his arm around Sara to calm her.

Defendant then took Sara to another bedroom, where he placed Sara on the bed, removed her pants, took off his own clothes, and sexually assaulted her. Sara, still feeling "dizzy" and "numb," blacked out again.

When she awoke the next morning, Sara still felt dizzy and "drugged." She tried to find her clothes but passed out again. Unable to find her clothes, Sara dressed in shorts and a sweater she found in the apartment. She got a ride home from the children's sitter around 8:00 a.m.

Later that day, Sara and the sitter returned to the apartment to retrieve Sara's belongings. Lozada, Ashley Maldonado, Luis, Brian, Vaquero, and defendant were still in the apartment. Vaquero found Sara's items and returned them. Sara then asked defendant about money she was owed from the previous night. Defendant explained she had to wait until her next shift to receive the

money. After she left the apartment, Sara went to the Passaic Police Department to report the sexual assaults.

Sara testified she did not consent to any sexual activities with defendant or anyone else at the club on November 5, 2012. She could not remember anything between the time she sat down at the bar after feeling dizzy and awaking briefly in the apartment bedroom as Brian assaulted her.

Maldonado's trial testimony

Because Sara was unable to recall details from the evening, other individuals at the gentlemen's club on November 4 and November 5, 2012, provided specific information about the events that night. Maldonado testified Luis entered the dancers' dressing room with a video camera, while the dancers were changing into their street clothes, and started recording. The jury saw video footage from the dressing room and heard Maldonado's testimony discussing the events in that footage, including that Sara seemed "out of it" and was "wobbling a little."

After leaving the dressing room, Maldonado testified Sara returned to the bar, but was unable to hold herself up and "seemed . . . incoherent." Maldonado described the numerous sex acts performed on Sara by various defendants while Sara lay prone on the bar and was "out of it."

5

Several defendants then took Sara to the "champagne room,"[3] and sexually assaulted her again. According to Maldonado, Sara's eyes were closed and she "was just laying there" during the champagne room assaults. Maldonado heard Sara say "ouch" a "few times."

Several individuals, including defendant, then went upstairs to the apartment[4] and brought Sara with them. Sara was standing at that point but still "out of it" and had to be helped up the stairs. Defendant and Brian then sexually assaulted Sara in different bedrooms in the apartment. There was no video footage of the sexual assaults in the apartment. However, Maldonado peeked into one of the bedrooms and saw Brian "having sex with [Sara]" but Sara "wasn't moving." Maldonado then went to another bedroom[5] to get some sleep. Maldonado testified she woke briefly and saw defendant "having sex with [Sara]."

---

[3] The "champagne room" was a private lounge in the gentlemen's club.

[4] To access the upstairs apartment, a person had to exit the club, walk through an alley way, and enter a separate stairwell leading to the apartment. The door to the upstairs apartment had a separate key from the exit and entrance doors to the club.

[5] Maldonado testified that the bedroom belonged to Vaquero.

A-2252-20

Maldonado told the jury she pled guilty to aiding and abetting aggravated sexual assault and received a five-year prison sentence rather than a potential twenty-year prison sentence had she gone to trial and been convicted. Pursuant to the negotiated plea, Maldonado agreed to testify for the State at co-defendants' trials.

The police search of the apartment above the club

In the early evening on November 5, 2012, Sara went to the Passaic Police Department and reported being sexually assaulted the prior evening. Sara then went to a hospital to give blood and urine samples. Sara told the hospital staff she was emotionally distressed and "disturb[ed]" because she had "no recollection" of what happened.

Sara returned to the police station the next day and gave a statement to Detective Sergeant Roy Bordamonte. During the interview, Sara identified defendant, Brian, and another man "with a cyst behind his head," later identified as De La Cruz, as the men who sexually assaulted her. Sara also said Luis and two dancers she knew as "Hollywood" and "Cookie"[6] were present. She further told the detective that Vaquero "kept giving her drinks" and, after she drank one

_____

[6] Maldonado used the stage name "Hollywood." Lozada used the stage name "Cookie."

A-2252-20

of them, she "felt really messed up." According to the officers who testified at the suppression hearing, Sara reported seeing "cameras in the apartment" but was not sure if the cameras were recording.

Shortly after the interview or around 2:00 a.m. on November 6, 2012, Detective Reinaldo Arroyo went to the gentlemen's club with Bordamonte, Detective Alex Flores, and several uniformed police officers. Upon entering the club, Arroyo approached Vaquero and Brian. Arroyo identified himself and explained the police were conducting an investigation. He provided no specific details about their investigation. The police then notified the club's patrons that the club was closing and requested each patron show identification before being allowed to leave.

After the club was closed, Arroyo spoke to Vaquero. Using the names Sara provided during her interview with the police, Arroyo asked Vaquero if he knew the whereabouts of Cookie, Hollywood, Luis, and Mike. Vaquero responded the two dancers, Cookie and Hollywood, were on stage, while Luis and Mike were "upstairs" in an apartment.

At the suppression hearing, Arroyo testified he asked Vaquero "if [Vaquero] could take [the officers] to where Luis and Michael [were]" and Vaquero "said yes." Vaquero escorted the officers upstairs to the apartment.

Arroyo stated Vaquero opened the door to the apartment with his key. Vaquero entered the apartment and held the door open for Detectives Arroyo and Bordamonte.

Arroyo further testified he entered the apartment "to speak to the people that were there," specifically defendant and Luis. At that time, Arroyo did not intend to search the apartment. Instead, he explained he wanted to "meet with" the individuals Sara identified and "ask if they would come to headquarters . . . to give . . . a statement." On cross-examination, Arroyo testified he "wasn't hoping to find anything" in the apartment and was "just there to investigate." Arroyo explained he did not advise Vaquero of his right to refuse the police entry into the apartment. Nor did Arroyo knock on the door or announce the officers' presence before following Vaquero inside the apartment. At no time did Arroyo tell the occupants of the apartment he was investigating an alleged sexual assault.

According to Arroyo, seconds after the officers entered the apartment, defendant "exited the first bedroom on the left" and "spontaneous[ly]" stated that he "had consensual sex with a dancer in [Vaquero's] room." Luis then walked out of the second bedroom.

9

Upon hearing defendant's statement, which he felt "corroborated [Sara's] story," Arroyo "retrieved a consent to search form" and asked if Vaquero would consent to a search of the apartment. Arroyo reviewed the form with Vaquero, which advised Vaquero of his rights to refuse to consent to any search, to revoke consent at any time, and to require a search warrant.

Vaquero agreed to the search and signed the consent form. The consent form stated Vaquero gave permission to search the apartment "voluntarily and without threats or promises of any kind being made to [him]." Arroyo further testified he took only "two steps" into the apartment before requesting Vaquero's consent to search the apartment.

After Vaquero signed the consent form, Arroyo asked Flores to enter the apartment to maintain "officer safety" and "keep an eye on everybody." Arroyo also asked defendant, Vaquero, and Luis to sit in the living room. Flores then pointed to a "cluttered" table in the living room with a video camera in plain sight. Flores asked the three men who owned the camera. Luis responded the camera belonged to him. Flores then asked Luis if he would consent to the officers viewing the footage on the camera. Luis declined. According to Arroyo, the officers focused on the camera because Sara "stated that she observed cameras in the apartment." After Luis declined to permit the officers

A-2252-20

to view the camera footage, Flores told Luis the police would obtain a search warrant for camera and video footage. While waiting for the search warrant, the police remained in the apartment to ensure potential evidence on the camera was not destroyed.

After receiving Vaquero's consent to search the apartment, Arroyo entered Vaquero's bedroom and "looked" around for "a couple of minutes." Bordamonte called for crime scene investigators (CSI) to "process the scene." The CSI team photographed Vaquero's room and took the bed linens from that room. The CSI officers seized evidence from other rooms in the apartment, including Luis's camera.

The police obtained a search warrant from a Passaic municipal court judge. According to the warrant, Sara claimed there were "cameras in the apartment" where she was sexually assaulted. Thus, pursuant to the warrant, the police seized Luis's camera, which they believed contained evidence of Sara's sexual assaults. According to Arroyo, the police located three other cameras in the apartment but those cameras appeared inoperable as they lacked SIM cards.

Arroyo and Bordamonte took defendant, Vaquero, Luis, Brian, Maldonado, and Lozada to police headquarters for interviews. None of these individuals were under arrest at that time. After the police viewed the video

footage from Luis's camera, complaint-warrants were filed against the six individuals and De La Cruz.

Forensic trial testimony

Min Tang, a forensic scientist with the State Police Office of Forensic Sciences, testified at trial. She analyzed Sara's urine and blood samples taken at the hospital. Tang found methorphan, a drug commonly used in cough syrup, in Sara's blood sample, and cocaine, marijuana metabolite, and acetone in Sara's urine sample. However, Tang testified she could not determine how the drugs got into Sara's blood or urine.[7]

The vaginal, cervical, and anal swabs taken from Sara at the hospital revealed the presence of sperm. The vaginal and cervical swab specimens matched defendant's DNA. Tang was unable to exclude defendant as a contributor based on the anal swab.

Defendant's trial testimony

Defendant confirmed his role as a manager at the gentlemen's club. He testified he had a "[b]usiness and personal" relationship with Sara. Defendant

---

[7] During her trial testimony, Sara denied ingesting marijuana, cocaine, or cough medicine on November 4 or 5, 2012. Sara did not know how those substances were in her blood and urine samples.

A-2252-20

claimed they "had . . . an attraction to each other."  He stated the two flirted and, "on a few occasions," "ha[d] make-out sessions" in the club's champagne room.

Regarding the events of November 5, 2012, defendant testified around 2:45 a.m. he began his usual routine of closing the club.  While he was closing the club, defendant saw Sara "flashing her breasts" for Brian.  After closing time, defendant stated the dancers went into the dressing room to change clothes before returning home.

According to defendant, he checked the exit doors, including one in the dressing room, to make sure the club's doors were locked.  Defendant said Sara was the last one in the dressing room and asked about money due to her. Defendant confirmed he told Sara she would have to wait to get her money.

Defendant then testified Sara "want[ed] to do a show and that she would do it for $300," paid "up front."  Defendant asked Sara what kind of show she wished to perform.  Sara purportedly told defendant "it was going to be a fully nude show, . . . there could be touching and feeling," but no sex acts.  Defendant responded he would "talk to Luis and see if [he could] get $300."  According to defendant, Luis said "okay."  During cross-examination, defendant claimed he did not tell anyone else at the gentlemen's club about his conversation with Sara.

Defendant next testified Sara did not appear to be unconscious or unaware of her surroundings based on the footage from Luis's video camera. According to defendant, Sara was able to "[c]ommunicate with people" and "looked like she was having a good time and being . . . wild." Defendant further testified Sara did not slur her words, but seemed "a little intoxicated."

Defendant confirmed he held Sara's legs open while she was laying on top of the bar and watched others perform sex acts on her. According to defendant, Sara was not distressed or "limp" at the time and appeared to be "enjoying it." Defendant further testified Sara did not express discomfort when others penetrated her with a beer bottle, explaining "she didn't . . . push it away" and never tried to close her legs.

Defendant claimed these activities fell within the boundaries Sara established for her "show." Defendant said he "asked [Sara] if she was good" while he held her on the bar, and she replied, "yeah." He claimed he told Sara to "let [him] know if there [was] anything, . . . [she was] not comfortable with," and Sara responded, "okay" and "kind of kept going." Defendant admitted he was "turned on" by watching others perform sex acts with Sara.

According to defendant, De La Cruz carried Sara to the champagne room. After De La Cruz returned to the bar, defendant saw Lozada help Sara get

14

dressed. Defendant testified he asked Sara if she was okay, and she confirmed she was. However, defendant said Sara reported she "didn't like the way [De La Cruz] was touching her." Defendant testified Sara agreed to "keep going" so long as De La Cruz did not "get near her or touch her." Defendant agreed to keep De La Cruz away from Sara.

After that conversation, defendant said he and Sara, at her initiation, "started messing around" on the couch in the champagne room. Defendant described sex acts he performed on Sara in the champagne room, which Lozada and Brian participated in. Defendant testified Sara did not seem uncomfortable and appeared to enjoy the activities in the champagne room.

Defendant then explained the group "decided to go upstairs." He claimed Sara was able to walk without assistance. Once in the apartment, defendant testified he went to his bedroom and "settled in" for "about ten minutes."

Defendant left his bedroom when he "heard [Sara] cursing" in the living room and yelling at De La Cruz. Defendant testified he got between Sara and De La Cruz to prevent the situation from escalating. Defendant said he hugged Sara, who was wearing only a tank top and a blanket. According to defendant, Sara kissed him and asked for her money. Defendant explained Sara would get

15

the money the following day. Defendant said Sara then started "making out" with him.

At that point, defendant asked if Sara wanted to go into a bedroom, and she said "yeah." Defendant took her into Vaquero's room, where defendant testified Sara undressed him. Defendant "started having sex" with Sara on the bed. According to defendant, Sara was conscious, did not resist, and was "into it." Defendant left the bedroom to get some water at Sara's request. When defendant returned, he said Sara moved to Brian's bedroom and wrapped herself in the blankets. Defendant testified he gave Sara a bottle of water, she thanked him, and he returned to his bedroom to sleep.

When defendant woke in the morning, Sara was gone. Defendant testified the police arrived at the apartment in the early hours of November 6, 2012. According to defendant, Detective Bordamonte "pulled [him] into Brian's bedroom and asked [him] if [he] had sex last night." When defendant responded in the affirmative, defendant claimed Bordamonte said, "[y]ou're in a lot of trouble."

Lozada's trial testimony

Lozada provided testimony limited to the sexual assaults of Sara in the gentlemen's club. Although Lozada saw Sara fall off a bar stool and knock over

16

a drink, she did not think Sara was "super drunk." Lozada provided testimony similar to that of defendant regarding the events at the bar and in the champagne room. Lozada testified Sara enjoyed, or was not adverse to, the sexual activities in the bar or champagne room other than those involving De La Cruz. Lozada further testified Sara "was doing a show," even though no one at the club told her that information.

<u>Sara's rebuttal trial testimony</u>

After defendant testified, the State recalled Sara to the stand. Sara denied being alone with defendant in the club's dressing room. She also denied offering to put on a "show" for $300.

<u>Procedural history</u>

Defendant was tried on eleven counts, renumbered as follows: three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(5) and (2)(a)(7) (counts 11, 13, and 14, formerly counts 95, 103, and 104); three counts of third-degree aggravated sexual contact, N.J.S.A. 2C:14-3(a) (counts 12, 15, and 16, formerly counts 97, 106, and 107); second-degree conspiracy, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:14-2(a)(7) (count 17, formerly count 102); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (counts 18 and 19,

formerly counts 121 and 122); and two counts of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (counts 20 and 21, formerly counts 124 and 125).

Prior to trial, defendant joined in the arguments raised by co-defendants Luis and Brian to suppress evidence found in the apartment. The motion judge conducted an evidentiary hearing and Arroyo testified about the search of the apartment as previously summarized.

At the suppression motion, defense counsel argued none of the detectives informed Vaquero that he could refuse to allow the police to enter the apartment. Thus, defense counsel asserted the subsequent search of the apartment was illegal. Defense counsel further claimed that, because the police were not in the apartment legally, the plain view exception to the warrant requirement did not justify the seizure of Luis's video camera. Because Arroyo did not advise Vaquero that he could refuse the officers entry into the apartment, defense counsel further argued Vaquero's consent to the search was not voluntary. Alternatively, because Sara failed to describe the specific camera she claimed to have seen in the apartment, defense counsel asserted the officers lacked probable cause to believe the video camera in the apartment's living room contained evidence of a crime.

The judge denied defendants' suppression motion. The judge found when Vaquero told Arroyo that defendant and Luis were "upstairs," agreed to take the detectives to the apartment, and then opened the apartment door with his key, Vaquero "[gave] the detectives the reasonable belief that he had the authority to let them in." The judge explained that while "[i]n the absence of a search warrant or other recognized exception [to the warrant requirement] . . . the police cannot enter a home over the resident's objections," officers "do not have to advise a resident whose permission they have requested to enter that they have a right to refuse entry." She noted that if the police "seek to search the home," such advisement would be necessary. However, the judge found the officers were seeking to speak with specific individuals as part of their investigation and not conducting a search. The judge also found no evidence Vaquero was "threatened or intimidated," and thus concluded he "willingly escorted the police" inside the apartment as part of the investigation.

The judge also found the State clearly and convincingly demonstrated Vaquero "knowingly and voluntarily" consented to the search of the apartment, and "knew that he had a right to refuse." The judge further determined the police had a "reasonable articulable suspicion that criminal activity had occurred" in

19

the apartment based on Sara's police interview and defendant's unprompted admission that he had sex with a dancer in Vaquero's bedroom.

Because the judge concluded the officers were lawfully in the apartment as a result of Vaquero allowing them entry, she held the discovery of Luis's video camera fell within the plain view exception. Since the video camera was in plain view of the officers in the apartment, who were there with Vaquero's consent, the judge found the camera "was justifiably seized." She further concluded the police "had probable cause to believe that the camera contained evidence of a crime" based on Sara's statement during her police interview that she saw cameras in the apartment. The judge also noted the police did not view the images on the video camera until they obtained a search warrant to do so. Thus, the judge denied the motion to suppress the physical evidence.

After denial of the suppression motion, defendant proceeded to trial alongside co-defendant Lozada. The trial spanned twenty-one days.

During the trial, defendant moved for a mistrial based on Sara's statement to the jury during cross-examination that De La Cruz was in jail because he "had something to do with how [she] ended up upstairs." According to defendant, Sara's "outburst" in front of the jury undermined his right to a fair trial by suggesting a non-testifying defendant had been convicted of offenses arising

from the same incident. Sara made this statement after being pressed by defense counsel several times to explain why she yelled at De La Cruz after being assaulted by Brian. While the State agreed Sara's remark was inappropriate, the State asked the judge to issue a curative instruction and allow the trial to continue. The judge required time to respond to the State's request for a curative instruction and took a lunch recess. Upon returning from the lunch recess, the judge had additional discussions with counsel on the record.

The judge denied the mistrial motion. She concluded Sara appeared frustrated by defense counsel repeating "the same questions over and over again." The judge determined Sara did not "deliberately" attempt to harm defendant's case and likely did not "understand the implications" of her statement.

The judge recounted her finding that Sara was "asked the same questions on various occasions" and "became frustrated and responded the way that she did" without understanding her response would "cause a problem." The judge concluded Sara's response was not "the fault of the prosecution or the State in any way" and the State did not "intend to cause a mistrial."

The judge explained she would inform the jurors as part of the final jury charge "to determine the guilt or innocence of each defendant separately based

21

on the evidence presented and nothing else."  The judge further stated she would issue an instruction striking Sara's testimony about De La Cruz being in jail and advise the jury to "disregard it."

When defense counsel continued to object to the proposed curative instruction, the judge found that even absent De La Cruz's testimony, the jury would "be able to judge his guilt or innocence . . . with their own eyes" by watching the video and hearing the testimony of other witnesses regarding his actions that night.  She stated the jury would "have to make a determination whether or not [defendant] was . . . an active participant" in the sexual assaults.

Before continuing the trial, the judge instructed Sara not to "say anything in front of the jury with regard to whether somebody is in jail or not."  When the jury returned to the courtroom, the judge gave the following instruction:

> You've heard testimony from the witness about one of the parties being in jail.  So I am instructing you, ladies and gentlemen, that the [c]ourt is striking that testimony.  It is not evidence in the case and I am instructing you that it shall not enter into your deliberations in any way, shape or form.  As I told you before with regard to stricken testimony when I tell you that something is stricken it must be disregarded by you.  That means that even though you may have remembered the testimony you are not in any way to use it in your discussions or your deliberations.

When the judge asked if the jurors understood, the jurors replied, "[y]es."

22

The judge continued:

> At the end of the case you are the jury. You determine the facts of the case. Nobody can usurp that right from you. You're to make those decisions and you are to determine the guilt or innocence of each defendant in this case before you separately. And that you're to consider each charge separately as to each defendant, and that you are to make that determination based on the evidence in the case and nothing else.

The judge asked the jury if they could abide by her instruction, and the jurors responded in the affirmative. The trial then continued.

At the conclusion of the case, the jury convicted defendant on all counts. On February 23, 2021, the judge sentenced defendant to an aggregate term of thirty years with an eighty-five percent parole bar.

On appeal, defendant raises the following arguments:

POINT I

> DUE TO THE POLICE'S UNLAWFUL ENTRY INTO THE HOME, SUPPRESSION WAS REQUIRED.
>
> A. Suppression Motion Facts and Ruling.
>
> B. The State Failed to Prove that Vaquero Knowingly and Voluntarily Consented to Police Entering the Apartment, thus the Evidence Must Be Suppressed.
>
> C. Alternatively, the Video Must Be Suppressed Because Police Lacked Probable Cause that the Camera Contained Evidence of a Crime.

23

POINT II

AFTER COMPLAINING WITNESS [SARA] TOLD THE JURY THAT NON-TESTIFYING CODEFENDANT DE LA CRUZ WAS INCARCERATED FOR WHAT HE DID TO HER, THE COURT'S REFUSAL TO GRANT A MISTRIAL DENIED [DEFENDANT] OF HIS RIGHTS TO CONFRONTATION, DUE PROCESS, AND A FAIR TRIAL.

POINT III

THE PROSECUTOR COMMITTED MISCONDUCT IN SUMMATION BY OFFERING UNSUPPORTED TESTIMONY THAT FILLED A MAJOR HOLE IN HER CASE, VOUCHING FOR HER WITNESSES, AND DENIGRATING THE DEFENSE. (Not raised below).

A. The Prosecutor Improperly Testified as an Expert in Toxicology.

B. The Prosecutor Told the Jury that Maldonado Testified Truthfully, and that Her Decision to Plead Guilty, Rather than Go to Trial Herself, Imbued Her With Enhanced Trustworthiness. This Vouching, Particularly When Coupled With Her Denigration of Defendant, Was Improper.

POINT IV

THE JURY INSTRUCTIONS WERE FATALLY FLAWED.

A. The Convictions on Counts 13-16 Must be Reversed Because the Judge Failed to Properly Instruct the Jury on Mental Incapacitation.

24

B. The Convictions On Counts 13, 15, 18, And 20 Must be Reversed Because the Judge Failed to Properly Instruct the Jury on Accomplice Liability.

POINT V

THE CUMULATIVE EFFECT OF THESE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.

POINT VI

THE EXCESSIVE 30 YEAR SENTENCE WITH 25½ YEARS WITHOUT PAROLE WAS BASED ON FLAWED FINDINGS AND A FAILURE TO CONSIDER THE FAIRNESS OF THE CONSECUTIVE AGGREGATE TERM. THE MAXIMUM SCVTF PENALTY WAS ALSO IMPROPERLY IMPOSED.

I.

We begin with defendant's argument that the motion judge erred in denying the motion to suppress evidence. Defendant raises two contentions in support of his argument. First, Vaquero did not validly consent to a search of the apartment. Second, the video camera was inadmissible under the plain view doctrine. We reject these arguments.

A.

We first address whether Vaquero's consent to search the apartment was invalid and, therefore, the evidence seized in the apartment should have been suppressed. In reviewing the denial of a motion to suppress physical evidence,

25

a trial court's factual findings "must be upheld" if supported by sufficient credible evidence in the record. State v. S.S., 229 N.J. 360, 374 (2017). This is because "the motion judge, unlike an appellate court, has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gonzales, 227 N.J. 77, 101 (2016) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). The trial court's factual findings should not be disturbed unless they are "so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). On the other hand, "a reviewing court owes no deference to the trial court in deciding matters of law." State v. Mann, 203 N.J. 328, 337 (2010).

There is a "clear preference" for police officers to "secure a judicial warrant before executing a search." Gonzales, 227 N.J. at 90. A search without a warrant is "presumptively unreasonable." State v. Cushing, 226 N.J. 187, 199 (2016). Thus, the State "bears the burden of proving the validity of a warrantless search," ibid., and must demonstrate that it fell into one of the "specifically established and well-delineated exceptions to the warrant requirement," State v. Frankel, 179 N.J. 586, 598 (2004) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)).

"Homes are particularly protected spaces" and "raise heightened privacy concerns." Cushing, 226 N.J. at 198. This is because the "very core of the Fourth Amendment . . . protects the right of the people to be safe within the walls of their homes, free from governmental intrusion." Frankel, 179 N.J. at 611. The State's burden to justify a warrantless search therefore, is "particularly heavy" when the search involves entry into a home. State v. Legette, 227 N.J. 460, 472 (2017). The State must demonstrate one of the exceptions to the warrant requirement "by a preponderance of evidence." State v. Brown, 216 N.J. 508, 527 (2014).

Defendant asserts the State failed to prove Vaquero knowingly and voluntarily consented to police entering the apartment, rendering the subsequent warrantless search invalid. He argues Arroyo did not inform Vaquero he had the right to refuse the detective's entry into the apartment. According to defendant, this omission rendered the search of the apartment illegal, despite Vaquero signing a consent to search form. Defendant contends Vaquero's consent was "nothing more than an acquiescence [to] authority in the face of subtle coercion."

When a person "consents to the search of his premises, he relinquishes the Fourth Amendment protection which prohibits unreasonable searches and

seizures." State v. King, 44 N.J. 346, 352 (1965). A search conducted after receiving consent is a "well-established exception" to the warrant requirement. State v. Domicz, 188 N.J. 285, 305 (2006).

Under Article I, Paragraph 7 of the New Jersey Constitution, "any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." State v. Carty, 170 N.J. 632, 639 (2002). The State bears the burden of showing the person providing consent "knew that he or she 'had a choice in the matter.'" Ibid. (quoting State v. Johnson, 68 N.J. 349, 354 (1975)). To be considered voluntary, "the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" King, 44 N.J. at 352 (quoting Judd v. United States, 190 F.2d 649, 651 (D.C. Cir. 1951)).

Courts have recognized that a person is likely to "feel some degree of compulsion whenever a police officer makes a request" for consent to a search. Domicz, 188 N.J. at 307. The question of whether consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). If it appears that consent has been granted "only in submission to a claim of lawful authority," or in response to "threats or force," the resulting search is unreasonable. Id. at 233.

When determining whether consent to a search was voluntary, "the proper analytical framework is whether a person has knowingly waived [the] right to refuse to consent to the search." Domicz, 188 N.J. at 308. As part of that "knowing" analysis, New Jersey courts "requir[e] the State to prove, as a precondition to the validity of a consent search, that a person have knowledge of his right to refuse to give consent." Id. at 307; Johnson, 68 N.J. at 353-54.

While New Jersey courts require an individual be told of the right to refuse consent to a search, an "occupant's knowledge of the right to refuse [is] not required every time law enforcement officers seek consent to enter a residence." State v. Williams, 461 N.J. Super. 80, 99 (App. Div. 2019) (emphasis added). For example, in State v. Padilla, 321 N.J. Super. 96, 102-03 (App. Div. 1999), the police went to a motel room to conduct an investigation after receiving a tip about a man entering the room with a handgun. When a woman came to the door, an officer identified himself and asked if he and his colleagues could enter the motel room. Id. at 103. The woman responded in the affirmative, and voluntarily opened the door for the officers to enter. Ibid.

In that case, we affirmed the trial court's denial of the defendants' motion to suppress the physical evidence observed in plain view by the officers. Id. at 107-10. We noted the officers "initially went to the motel, not to search but

rather to investigate" a gun tip. Id. at 107. We found there was "nothing unreasonable about [the officers'] request for permission to enter the room." Id. at 107-08. We expressly rejected the defendants' argument that the woman who answered the door did not validly consent to the officers' entry because the officers failed to advise her of the right to refuse such consent. Id. at 108. We explained that because "the officers did not seek consent to search," but "merely sought permission to enter to continue their investigation," the requirement that the police state an individual has a right to refuse consent to a search was "inapposite." Ibid. (emphasis added). We stated that once inside the motel room, the officers "did not conduct a search" and instead "made visual observations as they continued their inquiry." Ibid. (emphasis added). Based on those facts, we concluded the evidence seized was proper under the plain view exception to the warrant requirement. Ibid.

Here, Arroyo testified at the suppression hearing that he and his fellow detectives accompanied Vaquero to the apartment above the gentleman's club after shutting down the club and checking the identification of everyone present in the club. At that point, Vaquero was clearly aware the police were conducting some sort of investigation. The officers then asked if Vaquero knew where they could find defendant and Luis because the officers wanted to speak with them.

Vaquero volunteered to take the officers upstairs to the apartment to speak with the two men. Arroyo said he went upstairs to speak with the two men and ask them to come to the police station to give statements. Arroyo testified he did not enter the apartment with the intent to search for evidence.

Vaquero, using his own key, opened the apartment door and held it open for Arroyo and Bordamonte to enter. Neither detective informed Vaquero that he had the right to refuse them entry. But, under well-settled New Jersey law, the officers were not required to do so because they entered the apartment to investigate and not to search. Under the circumstances, we are satisfied the judge did not err in concluding the police entered the apartment lawfully because they were conducting an investigation, Vaquero voluntarily authorized their entry into the apartment to speak with defendant and Luis, and Vaquero signed a form consenting to the search of the apartment.

Nothing in the record suggests the detectives threatened or intimidated Vaquero when seeking entry into the apartment. Nor did the detectives' statements or conduct induce Vaquero to sign the consent form allowing the search of the apartment. Arroyo and Bordamonte took only a few steps into the apartment before retrieving a consent to search form and reviewing it with Vaquero. The consent form clearly stated Vaquero had the right to refuse

31

consent to the search. Thus, the officers did not violate Vaquero's constitutional rights because Vaquero invited officers into the apartment to continue their investigation by speaking with defendant and Luis. Additionally, the officers obtained Vaquero's written consent to search the apartment.

B.

We next consider defendant's argument that the video evidence from Luis's camera found in the apartment should have been suppressed. Defendant contends the police lacked probable cause to believe the camera contained evidence of a crime and, therefore, seizure of the camera was unlawful. We disagree.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). "That is so because '[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.'" State v. Johnson, 171 N.J. 192, 209 (2002) (alteration in original) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)).

For example, if the police have a warrant to search an area for specified objects and "come across some other article of incriminating character," the plain view exception applies. Coolidge, 403 U.S. at 465. Additionally, "the

32

'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless . . . comes across an incriminating object." Id. at 466.

Under such circumstances, the police have a "prior justification for [the] intrusion," placing the police in a position to discover evidence in plain sight. Ibid. Plain view alone is not, "in most instances," enough to justify the warrantless seizure of evidence. Gonzales, 227 N.J. at 104. Instead, an officer must already lawfully be in the area where the incriminating item is observed. Id. at 101. The legitimacy of a plain view seizure of evidence found in a home turns on the legality of the officer's initial entry. Johnson, 171 N.J. at 208.

An object is in plain view "if it can be seized without compromising any interest in personal privacy." Id. at 206. The plain view doctrine applies only where it is "immediately apparent that the seized item is evidence of a crime." Gonzales, 227 N.J. at 101. The doctrine does not allow officers to engage in a "general exploratory search from one object to another until something incriminating at last emerges." Coolidge, 403 U.S. at 466. The "immediately apparent" prong of the plain view exception requires a court to determine whether probable cause existed to associate an object in plain view with criminal activity before that object is seized. Johnson, 171 N.J. at 213.

Probable cause exists if, at the time police act, there is a "well[-]grounded suspicion" that a crime has been or is being committed. Id. at 214. Probable cause "merely requires that 'the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband . . . or useful as evidence of a crime.'" State v. Bruzzese, 94 N.J. 210, 237 (1983) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). The doctrine does not require this belief be correct or more likely true than false. Ibid.

Here, Flores saw Luis's video camera in the apartment after the officers lawfully entered, as we explained in Point I.A. Arroyo further testified Flores saw the camera shortly after entering the apartment because the camera was in plain view on the living room table. Further, in her statement, Sara told the officers she saw "cameras in the apartment." Because the police were not conducting a search and Flores was lawfully in the area where the video camera was discovered, no warrant was required under the circumstances.

The next question is whether the police had probable cause to believe the camera contained evidence of a crime. Although the judge concluded the camera itself was evidence and contained evidence of a crime, she did not elaborate on these findings. A video camera, untethered to a potential crime scene, may be an innocuous item, unlike drug paraphernalia or a firearm.

Here, Sara told the police she saw "cameras in the apartment."[8]  Because Sara reported she had been sexually assaulted in the apartment and the apartment had "cameras," the police had probable cause to believe the camera on the living room table contained evidence of the sexual assault.  When Flores entered the apartment and saw a video camera sitting on the living room table, he asked who owned it.  Luis responded the camera belonged to him.  Sara identified Luis as one of the people involved in the sexual assaults.  On these facts, the detectives had reasonable and "well[-]grounded suspicion," Johnson, 171 N.J. at 213, that Luis's camera "may [have been] . . . useful as evidence of a crime," Bruzzese, 94 N.J. at 237.  Having reviewed the record, and recognizing the police did not view the footage from the video camera until they obtained a search warrant, the judge did not err by concluding the seizure of the camera satisfied the plain view exception to the warrant requirement.  Thus, the footage from the camera was properly admitted at trial.

---

[8]  At the suppression hearing, Arroyo testified the other cameras in the apartment were inoperable because they lacked SIM cards.  Thus, the police focused on the only operable camera in the apartment, which was sitting on the living room table.

II.

We next consider defendant's argument that Sara's statement about De La Cruz being jailed for sexually assaulting her warranted a mistrial. We disagree.

"The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court." State v. Harvey, 151 N.J. 117, 205 (1997). We defer to a trial judge's decision, since he or she is "in the best position to gauge the effect of the allegedly prejudicial evidence." Ibid. Thus, the denial of a mistrial motion should not be disturbed "absent an abuse of discretion that results in a manifest injustice." Ibid.

A mistrial is "an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting Harvey, 151 N.J. at 205). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Allah, 170 N.J. 269, 281 (2002)). Alternatives to a mistrial include the use of "a curative instruction, a short adjournment or continuance, or some other remedy." Ibid.

Trials are "often unpredictable," and "even the most precise question . . . may bring an unexpected response from a witness," causing the jury to hear inadmissible evidence. Yough, 208 N.J. at 397. Such "[a]lleged errors induced

36

by counsel 'ordinarily are not a basis for reversal on appeal.'" Id. at 399 (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). Even where the State acts improperly, its actions may not warrant a mistrial unless there is a clear showing that the defendant suffered actual harm. State v. LaBrutto, 114 N.J. 187, 207 (1989). If it is likely that "the results of the trial would have been the same," the mistake is harmless because it did not "deprive [the] defendant of a fair trial." State v. Camacho, 218 N.J. 533, 554-55 (2014).

In particular, there is a risk when jurors learn that "one co-conspirator has pleaded guilty to a joint crime" they "might believe . . . that others similarly charged are also guilty." State v. Stefanelli, 78 N.J. 418, 432 (1979). "[A] defendant on trial is entitled 'to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else.'" Id. at 433 (quoting United States v. Toner, 173 F.2d 140, 142 (3rd Cir. 1949)). Accordingly, evidence of a co-defendant or witness's guilty plea based on a "joint crime" is inadmissible as "substantive evidence of [a] defendant's guilt." State v. Adams, 194 N.J. 186, 208 (2008).

If a co-defendant testifies, evidence of a guilty plea may be admitted for the "limited" purpose of assessing their credibility. State v. Murphy, 376 N.J.

Super. 114, 122 (App. Div. 2005).  However, if the co-defendant is not called to the stand, there is "no occasion to inform the jury of [the] conviction," because there is no need to impeach that person as a witness.  State v. Felton, 131 N.J. Super. 344, 351 (App. Div. 1974).

If inadmissible evidence is inadvertently presented to the jury, the denial of a mistrial may be upheld on appeal "based on the trial court's directive to the jury to disregard a prejudicial comment."  State v. Winter, 96 N.J. 640, 647 (1984).  "The absence of a limiting instruction to the jury restricting the use of a guilty plea to the issue of credibility is usually an important factor in determining whether the admission of the plea constitutes harmless error."  Stefanelli, 78 N.J. at 435.  When weighing the effectiveness of a curative instruction, we give deference to the trial court's determination.  Winter, 96 N.J. at 647.  The adequacy of the curative instruction "necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached."  Ibid.  It is presumed that a jury will follow a trial court's limiting instructions.  State v. Brunson, 132 N.J. 377, 386 (1993).

Here, we are satisfied the judge did not err in denying defendant's mistrial motion.  We agree Sara's statement to the jury that De La Cruz was "in jail" because he "had something to do with how [she] ended up upstairs" was

inadmissible. This is true particularly because De La Cruz did not testify at trial. However, the prosecutor did not elicit this testimony from Sara. Sara made the statement in response to defense counsel's repetitious questions during cross-examination. The judge agreed the testimony was improper and expressly instructed the jury to disregard it. The judge also instructed the jurors to consider defendant's guilt or innocence "separately" from any other defendant and to reach a verdict based solely on the admissible evidence presented in this case.

While defendant argues the judge's curative instruction was "delayed," the judge took a lunch recess and then another hour to form her reasons for denying defendant's mistrial motion and craft an appropriate curative instruction for the jury. We are satisfied the judge's curative instruction remedied any potential prejudice. Therefore, the judge did not abuse her discretion in denying defendant's mistrial motion.

III.

We next consider defendant's argument, raised for the first time on appeal, that the prosecutor erred during her summation. Defendant focuses on two alleged errors during the State's closing argument: 1) presenting "testimony" as

to facts outside the record; and 2) impermissibly vouching for Maldonado's testimony on behalf of the State.

Where, as in this case, a defendant fails to object to a prosecutor's remarks at the time they were made, any asserted improper comment must be evaluated for plain error. State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001). A failure to object suggests defense counsel did not believe the prosecutor's remarks were prejudicial when made and deprives the trial court of the opportunity to take curative action. State v. Frost, 158 N.J. 76, 83-84 (1999).

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented," and they are "expected to make vigorous and forceful closing arguments to juries." Id. at 82. However, a prosecutor "must refrain from improper methods that result in a wrongful conviction." State v. Smith, 167 N.J. 158, 177 (2001).

Nevertheless, even a finding that a prosecutor made an improper statement "does not end a reviewing court's inquiry; in order to merit reversal, the misconduct must have deprived the defendant of a fair trial." State v. Hawk, 327 N.J. Super. 276, 281 (App. Div. 2000). The prosecutor's conduct must have been "so egregious," State v. Ramseur, 106 N.J. 123, 322 (1987), that it

"substantially prejudiced [the] defendant's right to have a jury fairly evaluate the merits of his defense," State v. Timmendequas, 161 N.J. 515, 575 (1999). Additionally, a prosecutor's statements that would otherwise be prejudicial "may be deemed harmless if made in response to defense arguments." State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011). We "must assess the prosecutor's comments in the context of the entire trial record," State v. Nelson, 173 N.J. 417, 472 (2002), including whether the trial was lengthy and the prosecutor's remarks were short or "errant." State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

## A.

We first consider defendant's argument the State relied on facts not part of the trial record during summation. Defendant contends the prosecutor "effectively testified . . . about methorph[a]n's effects and the significance of its presence in [Sara]'s blood," notwithstanding the judge's decision barring the State's expert forensic scientist from testifying on those topics. He argues the prosecutor's statements during closing argument "implied a superior knowledge of toxicology" and could have persuaded the jury into believing the State's theory that Sara was drugged and could not consent to sexual activity.

Here, Tang testified she found methorphan in Sara's blood and urine samples. As a follow up, the prosecutor asked Tang what methorphan "do[es] in cough syrup." Defense counsel objected, asserting Tang's expert report did not discuss what the drugs found in Sara's samples "do," only that the drugs were present. Defense counsel argued Tang's expert qualifications were limited to her role in performing the blood and urine tests and discovering any drugs contained in those samples. However, defense counsel asserted Tang was not qualified to offer testimony about how the drugs might affect a person or, specifically, Sara. The prosecutor agreed Tang could not respond to questions pertaining to Sara particularly. However, the prosecutor explained she only sought to ask Tang, generally, what methorphan "does . . . to the body."

The judge then dismissed the jury briefly. The judge told the prosecutor to ask Tang the intended line of questioning outside the jury's presence so the judge could determine whether the questions were permissible based on Tang's report and expert qualifications. Following this colloquy, because Tang's report did not contain information on these subjects, the judge concluded Tang could not testify about anything other than "what was present in [Sara's] system" based on Tang's testing.

A-2252-20

However, the judge explained the State was not precluded from "making whatever common sensical, common knowledge arguments can be made to a jury with regard—everybody's taking cough syrup, for goodness sake, you know." The judge stated, "the same way the defense [could] argue that [methorphan] had no effect, the State [could] argue that it did have an effect coupled with alcohol," which the judge noted "[e]verybody knows . . . is a depressant." The judge concluded the prosecutor could "make those arguments separate and apart from the expert testimony," but could not "do it backed by the weight of the testimony of the doctor" because the State had not provided an expert report on that subject. The prosecutor abided by the judge's ruling, and Tang testified as previously discussed.

During his summation, defense counsel remarked that he "[didn't] think [it was necessary] to have someone come in and give an instruction on how people administer" cocaine and marijuana because the jurors "all live in the real world" and know how these drugs are ingested. Co-defense counsel also said it did not "make any sense" to believe that either of these drugs could be put into Sara's drink. Defense counsel stated Sara's system had "a chemical that's found in cough syrup," and this chemical "might make you a little drowsy."

43

In her closing, the prosecutor stated Sara had another "direct attacker . . . working powerfully and deliberately to make sure [her] attempts to protect her body were futile" beyond the physical actions of defendants during the sexual assaults. Specifically, the prosecutor referred to "the drug that was put in her drink." When describing Sara's physical state and behavior depicted in the video footage, the prosecutor said Sara was "feeling the effects of the methorph[a]n in her body" and "becoming weaker and weaker from the methorph[a]n and the alcohol." The prosecutor told the jury during closing:

> So, ladies and gentlemen, we all know what cough medicine does to our body, right? You're familiar with that. It makes us drowsy. It makes us unable to keep our eyes open. [Sara]'s account of what she remembers was corroborated. It was corroborated [by] what we see in the video and what Min Tang told us.
>
> You've heard from our toxicology expert who testified that cocaine, methorph[a]n and marijuana were found in [Sara]'s urine. But the only drug found in her blood, sixteen hours after the sexual assault began . . . was methorph[a]n.
>
> Ladies and gentlemen, I submit when we take cough medicine[,] we take it every four to six hours to make sure it can maintain its effect. How did this methorph[a]n stay in her body, in her bloodstream for at least sixteen hours? That's how powerful it was.

Defense counsel did not object to these remarks.

Prosecutors "must argue based on facts in the record," Timmendequas, 161 N.J. at 595, and not "make inaccurate legal or factual assertions during trial," Smith, 167 N.J. at 178.  Prosecutors are generally limited to commenting on the evidence and drawing reasonable inferences supported by the evidence. State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997).  Prosecutors must not imply to the jury that they possess knowledge beyond that contained in the record, State v. Feaster, 156 N.J. 1, 59 (1998), and "may not invite the jury to speculate about facts not in evidence." McGuire, 419 N.J. Super. at 146.

However, statements by a prosecutor that would otherwise violate this rule "may be deemed harmless if made in response to defense arguments."  Id. at 145.  In McGuire, we concluded some of the prosecutor's statements were fairly based on the evidence and made in response to the defense counsel's own arguments and, while other statements constituted "improper speculation," those other statements did not substantially prejudice the defendant's right to a fair trial.  Ibid.; see also State v. Perry, 65 N.J. 45, 47-48 (1974) (prosecutor's response in summation to "heavy handed statements" made by defense counsel in summation did not constitute prejudicial error); State v. Munoz, 340 N.J. Super. 204, 215-16 (App. Div. 2001) (prosecutor's comment about marks on

defendant's face deemed permissible response to defense counsel's statement calling officer's testimony about those marks into question).

Here, we are satisfied the prosecutor's remarks concerning methorphan and its potential effect on Sara did not constitute reversible error. The prosecutor adhered to the judge's ruling precluding Tang's testimony as to certain subjects. During her summation, the prosecutor said only that Tang testified drugs were present in Sara's blood and urine samples. Moreover, Lozada's counsel commented during summation that methorphan could cause drowsiness. The prosecutor simply did the same, consistent with all other evidence presented to the jury. The toxicology evidence showed Sara had methorphan in her blood and urine many hours after she drank a beverage which caused her to feel dizzy and fuzzy. Accordingly, the prosecutor's remarks about methorphan do not warrant a reversal.

### B.

We next consider defendant's argument the prosecutor improperly vouched for Maldonado's truthfulness and, therefore, "implied a personal belief in [defendant's] guilt, perhaps through extra-record information." We disagree.

During his closing statement, defendant's counsel compared the demeanor and credibility of the State's witnesses to defendant's demeanor and credibility.

46

In speaking to the police in 2012, defense counsel told the jury, Maldonado said Sara consented to "give a show" and engage in sexual activity with the group on November 5, 2012. He followed this statement with the following: "[A]nd then all of a sudden in 2015 [Maldonado] takes a plea. And then in 2017 and 2019 . . . all of a sudden, . . . there's—[Sara] was incoherent and these people sexually assaulted her." In his summation, defense counsel commented: "[I]t all changes now when [Maldonado's] got her, . . . arrangement with the State, right? Now, all of a sudden, . . . no show, no consenting. It's a sexual assault, right? All of a sudden she sees things that she didn't see before." Defense counsel told the jury the State's case consisted of the video, Sara's testimony, and Maldonado's testimony, and that Maldonado was "on [the State's] side."

In addressing Sara's capacity to consent, defense counsel told the jury the State only presented Sara's testimony that she repeatedly blacked out. Because no other "third party" verified Sara's claims, defense counsel suggested the State "brought in Ashley Maldonado" and "Ashley [did] the job" by corroborating Sara's sexual assault claim. He also reminded the jury during summation that Maldonado "pled guilty" and "changed twenty years for five years to testify against [the defendants]." Additionally, defense counsel highlighted the discrepancies between Maldonado's 2012 statement to the police and her trial

47

testimony, reiterating that after entering a guilty plea, Maldonado changed her story "all of a sudden" and "flip flopp[ed] like a fish."

In his own closing, Lozada's counsel remarked Maldonado's testimony was "tainted" because it "came at a price . . . as a quid pro quo . . . as a result of a deal that she made to avoid . . . up to twenty years in jail."  Co-defense counsel suggested Maldonado "knew that in order to get that deal she had to testify, that she had to say something to indicate that the others were guilty along with herself."  He argued Maldonado was "very important to the State" and "that's why a deal was made—because the State needed something other than the video, someone to say, I was there and I can tell you it was clear that [Sara] was not consenting."  He also asserted Maldonado's testimony had "nothing to do with the truth of the matter, but with taking care of herself with the situation and avoiding certain other consequences."

In her summation, the prosecutor told the jury they "[didn't] have to like [Maldonado]" but that they should "place substantial weight on the fact that she . . . accepted responsibility for what she [had] done" by pleading guilty.  The prosecutor repeated,

> She has pled guilty.  She didn't do right by [Sara].  She's now acknowledge[d] what she's done.  She did not come here to profess to you that she is innocent.  That's not why she came.  She came here to accept

48

responsibility for her crime and testified truthfully as to what occurred on the night in question. And that's what she did.

Neither defense counsel objected to these statements.

In charging the jury, the judge instructed Maldonado pled guilty to aggravated sexual assault and "was charged with the crimes that the defendants are on trial for." The judge explained evidence of Maldonado's guilty plea "may be used only in determining the credibility or believability of [Maldonado's] testimony." Additionally, the judge advised the jury could consider whether a person who "failed to comply with society's rules would be more likely to ignore the oath requiring truthfulness on the witness stand," and "whether [Maldonado] ha[d] a special interest in the outcome of the case" or was "influenced by the hope or expectation of any favorable treatment." However, the judge cautioned that the jury could "not use Ashley Maldonado's plea of guilty as evidence that these defendants are guilty of the crimes that they're charged with."

A prosecutor may argue a witness is credible, but may not "personally vouch for the witness," State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004), or "express a personal belief or opinion as to the truthfulness of his or her witness's testimony," State v. Staples, 263 N.J. Super. 602, 605 (App. Div. 1993). "Such comments can convey the impression that evidence not presented

A-2252-20

to the jury, but known to the prosecutor, supports the charges against the defendant." United States v. Young, 470 U.S. 1, 18 (1985).

Even if a prosecutor strays from this rule and argues during summation that a witness was truthful, a reversal may not be warranted if a witness's credibility was highly contested at trial and the jury heard both sides of the argument through cross-examination. State v. Marshall, 123 N.J. 1, 156-57 (1991). Additionally, if a prosecutor's statement regarding a witness's credibility "contain[s] no suggestion" of reliance on evidence outside the record, and instead refers to the witness's own testimony or other properly adduced evidence, the statement does not constitute misconduct. Young, 470 U.S. at 19. Further, if a prosecutor's remarks "are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" Smith, 167 N.J. at 178 (quoting State v. Johnson, 31 N.J. 489, 510 (1960)).

As previously noted, the State is permitted to respond to arguments made by the defense. State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996). A prosecutor may fairly comment upon defense counsel's tactics and respond "in order to 'right the scale.'" Engel, 249 N.J. Super. at 379. "A prosecutor is not

forced to idly sit as a defense attorney attacks the credibility of the State's witnesses." Hawk, 327 N.J. Super. at 284.

Here, we acknowledge the prosecutor told the jury Maldonado "testified truthfully as to what occurred." However, the prosecutor's comment as to Maldonado's credibility was brief compared to defense counsels' repeated statements during summation that Maldonado's guilty plea provided a strong incentive to lie. Additionally, the prosecutor's statements were based on evidence adduced in the trial record. The prosecutor told the jury that Maldonado wanted to "do right by [Sara]," as Maldonado stated during her own trial testimony. The prosecutor also said Maldonado "accepted responsibility," spoke openly of her participation in Sara's assault, and did not "profess" her "innocen[ce]."

Having reviewed the record, we are satisfied the judge instructed the jury properly regarding their consideration of Maldonado's guilty plea when evaluating Maldonado's credibility. The judge told the jurors it was their responsibility to decide whether Maldonado's trial testimony was truthful or influenced by hoping to receive favorable treatment for her own role in the sexual assaults. On this record, the prosecutor's single brief statement that

51

Maldonado was "truthful" did not prejudice defendant and, therefore, does not warrant a reversal of his convictions based on prosecutorial error.

## IV.

We next address defendant's argument that the jury instructions governing mental incapacity and accomplice liability were "fatally flawed." Again, we disagree.

"It is axiomatic that appropriate jury instructions are essential for a fair trial." State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993). Incorrect instructions are "poor candidates for rehabilitation under a harmless-error analysis," State v. Rhett, 127 N.J. 3, 7 (1992), and are "excusable only if they are harmless beyond a reasonable doubt," State v. Vick, 117 N.J. 288, 292 (1989) (quoting State v. Crisantos, 102 N.J. 265, 273 (1986)). However, reversal is not warranted unless an error is sufficient to raise a reasonable doubt as to whether it "led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

## A.

Defendant contends his convictions for aggravated sexual assault must be reversed because the judge gave erroneous instructions to the jury regarding Sara's alleged mental incapacitation. He claims the judge impermissibly shifted

52

the burden to defendant to disprove the mental incapacitation element of the charged crimes.

During the charge conference, the judge and counsel discussed the jury instruction on mental incapacitation for the aggravated sexual assault charges. Under N.J.S.A. 2C:14-2(a)(7)(b), an actor is guilty of aggravated sexual assault if they commit "an act of sexual penetration with another person" when that person "is one whom the actor knew or should have known was . . . intellectually or mentally incapacitated."

The judge and counsel discussed the need to inform the jury that analyzing whether Lozada "knew or should have known" Sara was mentally incapacitated at the time of penetration required considering both her subjective understanding of the situation and the objective understanding of a reasonable person. During the charge conference, Lozada's attorney argued the jury should consider Sara's alleged mental incapacitation "through the eyes of a reasonable person . . . in light of all the surrounding circumstances." Defendant's attorney agreed, asserting the judge should instruct the jury it "must determine whether Trystal Lozada knew of the mental incapacitation by viewing the evidence through . . . her eyes" and determine whether a reasonable person would have known of

Sara's alleged incapacitation "under all of the attendant circumstances," including "all [the] noise" of the club and "everything that [was] going on."

When the charge conference continued the next day, defendant's counsel raised an issue concerning the jury instruction on the aggravated sexual assault charges. Counsel highlighted proposed language that "[d]efendant can avoid liability only if you find that [he] did not know and that a reasonable person under all the circumstances would not have known" Sara was incapacitated. Defendant's attorney argued this phrasing "suggest[ed] to the jury that there's some obligation that a defendant puts forth some evidence," when the burden was "on the State to convince this jury beyond a reasonable doubt that either [defendant] or Ms. Lozada knew . . . or . . . reasonably would have known under the circumstances."

In response, the judge noted "various places in the charge" indicated "the State has to prove each element beyond a reasonable doubt," which included the mental incapacitation element. The judge further stated the "avoid liability" language came from the Supreme Court's decision in State v. Olivio, 123 N.J. 550 (1991), and found the instruction as worded "particularly clear" and did not "shift[] the burden in any way, shape or form onto the defense."

In charging the jury, the judge stated "[t]he burden of proving each element of a charge beyond a reasonable doubt rests upon the [S]tate" and that the "burden never shifts to the defendant." In discussing the aggravated sexual assault charges, the judge provided the following instruction regarding Sara's alleged mental incapacitation:

> The fourth element the State must prove beyond a reasonable doubt is that the defendant knew or should have known that [Sara] was physically helpless, mentally incapacitated rendering her temporarily incapable of understanding the nature of her conduct including, but not limited to, being incapable of providing consent.
>
> Although I've already instructed you on the definition of knowingly, again, you must analyze the requirement differently here. Here [the] knowledge requirement contains both a subjective element, whether the defendant knew, and an objective element, whether the defendant should have known.
>
> Under a subjective standard you view the events from the defendant's point of view. Stated differently, you must determine whether Michael Ramirez knew of the mental incapacitation by viewing the events through his eyes.
>
> Under an objective standard the evidence is viewed from a reasonable person's point of view. You must determine whether a reasonable person under all of the surrounding circumstances would have known of the mental incapacitation. Defendant can avoid liability only if you find that he did not know and that a

55

reasonable person under all of the surrounding circumstances would not have known.

If you find the State has proven beyond a reasonable doubt each of these four elements, then, you must find the defendant guilty of the crime of aggravated sexual assault. On the other hand, if you find the State has failed to prove any of these elements beyond a reasonable doubt you must find the defendant not guilty of aggravated sexual assault.

In preparing jury instructions, a judge may use the model jury charges, which are often "helpful." State v. Concepcion, 111 N.J. 373, 379 (1988). However, a judge should mold the instruction "in a manner that explains the law to the jury in the context of the material facts of the case." Ibid. If an instruction differs from the model jury charge but communicates the relevant law "clearly," it should be considered proper. State v. R.B., 183 N.J. 308, 325 (2005).

The model jury charge on aggravated sexual assault with mental incapacitation reads, in pertinent part, as follows:

The fourth element that the State must prove beyond a reasonable doubt is that defendant knew or should have known that the [victim] was . . . mentally incapacitated . . . which rendered the victim temporarily or permanently incapable of understanding the nature of (his/her) conduct, including, but not limited to, being incapable of providing consent.

If you find that the State has proven beyond a reasonable doubt each of these four elements, then you

> must find the defendant guilty of the crime of aggravated sexual assault.
>
> [Model Jury Charge (Criminal), "Aggravated Sexual Assault (Mentally Incapacitated)" (rev. Feb. 6, 2012).]

Here, the judge's instruction on the mental incapacitation element of aggravated sexual assault was more extensive than the model jury charge. The judge specifically explained how the jury should consider whether defendant "knew or should have known" Sara was incapacitated. The judge provided a detailed discussion of the subjective and objective aspects of mental incapacitation, instructing the jury to consider whether defendant "knew" by viewing the events "through his eyes" and whether he "should have known" by evaluating a reasonable person's understanding of the events "under all the surrounding circumstances."

Defendant focuses on the "avoid liability" sentence in the jury instructions, arguing the phrase constituted improper burden shifting. The judge paraphrased the mental incapacitation element of aggravated sexual assault from the following statement in Olivio, 123 N.J. at 568: "The knowledge requirement contains both a subjective element—whether defendant knew—and an objective element—whether defendant should have known. Defendant can avoid liability only if neither the subjective nor the objective element is proved."

The burden of establishing each element of an offense rests with the State. State v. Thomas, 132 N.J. 247, 253 (1993). The judge's wording of the instruction on this element suggested to the jury that defendant needed to prove he did not know Sara was incapacitated and that a reasonable person also would not have known in order to "avoid liability." The judge should have explained to the jury the State needed to prove defendant either knew or should have known of Sara's incapacitation to establish guilt.

However, we are satisfied the judge's instruction did not have the capacity to "[lead] the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 336. Several times, the judge instructed the jury that the State must prove each element of each charge beyond a reasonable doubt, including the aggravated sexual assault charges. In fact, immediately after the "avoid liability" language in the jury charge, the judge reminded the jurors that the State bore the burden of proof. Under these circumstances, and considering the jury charge as a whole, we are satisfied the jurors were unlikely to have thought defendant had to disprove any element of sexual assault to avoid conviction. On this record, any error in the jury charge was harmless and does not warrant reversal of defendant's convictions.

A-2252-20

B.

We next review defendant's arguments regarding the jury instruction on accomplice liability. Defendant asserts the judge failed to instruct the jury that he could only be found guilty as an accomplice if he intended to participate in the specific crime charged and shared the same mental state as the principal. Thus, he argues the convictions on counts thirteen, fifteen, eighteen, and twenty must be reversed.

The charge conference included discussion regarding the proposed jury instruction on accomplice liability for the charges against Lozada, which would also be used for the charges against defendant. During the conference, defendant's counsel argued the judge needed to include a statement that Lozada "can be held to be an accomplice with equal responsibility only if you find as a fact that she possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal acts." The judge agreed and stated she would "change every accomplice liability charge" for both defendants to reflect inclusion of counsel's suggested statement.

Defendant's counsel further argued at the charge conference that the accomplice liability instructions should include a statement telling the jurors that "to convict [Lozada] as an accomplice of the specific crime charged," the

A-2252-20

jury would need to "find that [she] had the purpose to participate in that particular crime" and acted "with [the] purpose of promoting or facilitating the commission of the substantive crime . . . with which she is charged." Because such language was included in the model jury charge, the judge agreed not to alter that language.

When instructing the jury on the aggravated sexual assault and aggravated criminal sexual contact charges against defendant, the judge stated a person is legally accountable for the conduct of another "when he is an accomplice of such other person." The judge explained, "a person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense he aids or agrees or attempts to aid such other person in planning or committing it." To find defendant guilty on count thirteen, the judge said the jury needed to find: (1) that one or more of the other people involved in the November 5, 2012 incident committed aggravated sexual assault against Sara while she was mentally incapacitated; (2) that defendant "did aid or agree or attempt to aid" that person or persons "in planning or committing the crime"; (3) that defendant's "purpose was to promote or facilitate the commission of the offense"; and (4) that defendant "possessed the

criminal state of mind required to be proven against the person who actually committed the act."

The judge further instructed the jury that "[t]o constitute guilt there must exist a community of purpose and actual participation in the crime committed." As the judge explained, to find defendant guilty, the jury had to find that he "act[ed] with the purpose of promoting or facilitating the commission of the substantive crime with which he's charged" and had that specific crime as his "conscious object."

During deliberations, the jury asked the judge to define "criminal state of mind." The judge replied the phrase was found in the instructions on accomplice liability. The judge suggested to counsel she would tell the jury that to find Lozada or defendant guilty as an accomplice, it would need to find that the State "prove[d] beyond a reasonable doubt that the defendant shared the same state of mind to participate in a particular crime, whether it be purpose or knowledge." The "purpose or knowledge" language referred to the requisite states of mind for the counts at issue. Both defense counsels suggested the judge again instruct that the State needed to "prove that it was the defendant's conscious object that the specific conduct charged be committed."

In response to the jury's question, the judge, with the agreement of counsel, provided the following supplemental instruction:

> You requested that the [c]ourt define criminal state of mind. The [c]ourt reviewed the final charge along with counsel and determined that the term—that those terms arise in the context of the accomplice liability portion of the charges.
>
> So the [c]ourt's going to address that definition, criminal state of mind, in that context. So by definition an accomplice is a person who acts with the purpose of promotion or facilitating the commission of the substantive or underlying crime for which he or she is charged as an accomplice. So to find the defendant guilty of a crime as an accomplice one of the elements the State must prove beyond a reasonable doubt is that a defendant shared in the intent which is the underlying crime's basic element.
>
> Meaning, did the principal actor act knowingly or purposely depending on the crime charged? Two, did the defendant at least indirectly participate in the commission of the criminal act? And three, did the defendant also act knowingly or purposely depending on the underlying crime. So the criminal state of mind is either knowingly or purposely depending on the underlying crime.

"When a prosecution is based on a theory that a defendant acted as an accomplice, the court is obligated to provide the jury with accurate and understandable jury instructions" on that issue. State v. Bielkiewicz, 267 N.J. Super. 520, 527 (App. Div. 1993). In order to convict a defendant as an

accomplice, the jury must be instructed to find the defendant "shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." State v. Fair, 45 N.J. 77, 95 (1965). This is because "[a]n accomplice is only guilty of the same crime committed by the principal if he [or she] shares the same criminal state of mind as the principal." State v. Whitaker, 200 N.J. 444, 458 (2009). If the defendant lacked that "specific intent" that the charged crime be committed, or did not actually "aid or abet" the principal to commit it, the State has not satisfied its burden to show the defendant was an accomplice to that crime. Id. at 461-62.

Again, having reviewed the record, we conclude the judge properly explained the principles of accomplice liability as part of the jury instructions. The judge's accomplice liability charge followed the model jury charge on the subject. The model jury charge states that to find a defendant guilty as an accomplice, the jury must find there was "a community of purpose and actual participation in the crime committed," the "defendant failed to make proper effort to prevent the commission of the offense," the "defendant's conscious object that the specific conduct charged be committed," and the defendant acted "with the purpose of promoting or facilitating the commission of the substantive crime." Model Jury Charge (Criminal), "Liability for Another's Conduct—

Accomplice" (rev. June 7, 2021).  The judge's instruction included the elements of accomplice liability stated in the model jury charge.

While the judge's answer to the jury's question about "criminal state of mind" did not reiterate the "conscious object" phrase requested by defense counsel, the judge's response included the other operative language of the court's initial jury instruction and the model jury charge in a shorter form.  The judge explicitly told the jury they needed to find that defendant shared in the same criminal state of mind as any principal to be guilty as an accomplice.  On this record, the judge's jury instruction was not erroneous.

V.

In the event none of his asserted errors individually warrant reversal of his convictions, defendant asserts the cumulative effect of asserted errors denied him a fair trial.  We disagree.

Under the cumulative error doctrine, where a trial court's errors "are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair," a new trial by jury must be granted.  State v. Orecchio, 16 N.J. 125, 129 (1954).  Although each established error may not warrant reversal individually, a court may find that the errors together deprived the defendant of due process.  Id. at 134.  However, even where a defendant alleges

multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014). Where an appellate court finds no errors at trial, it may reject a defendant's invocation of the cumulative error doctrine. State v. Rambo, 401 N.J. Super. 506, 527 (App. Div. 2008).

Here, there was no cascade of trial errors. The only possible error was the judge's instruction on mental incapacitation. Despite the judge's misstatement in charging mental incapacitation, the judge instructed the jury several times during the entirety of the charge that the State must prove each element of each charge beyond a reasonable doubt. Under the circumstances, the instruction was not sufficiently prejudicial to render defendant's trial unfair. Thus, we are satisfied the cumulative error doctrine is inapplicable in this case.

## VI.

Defendant next argues the judge's sentence is flawed. He claims the judge erred in applying aggravating factors one, two, three, four, and nine. Additionally, he contends the judge should have placed greater weight on mitigating factors seven and eleven. He further asserts the judge should not have imposed consecutive sentences for counts eleven and thirteen, claiming the judge failed to consider the overall fairness of the sentence under Torres.

Defendant also challenges the $6,000 penalty imposed under N.J.S.A. 2C:14-10.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). A trial court enjoys "considerable discretion in sentencing." State v. Blann, 429 N.J. Super. 220, 226 (App. Div. 2013), rev'd on other grounds, 217 N.J. 517 (2014). An appellate court first must review whether the sentencing court followed the applicable sentencing guidelines. State v. Natale, 184 N.J. 458, 489 (2005).

Here, defendant was sentenced to fifteen years on count eleven, fifteen years on count thirteen, and twelve years on count fourteen. These counts addressed the first-degree aggravated sexual assault charges. The remaining eight counts on which defendant was convicted merged with the foregoing charges. Under N.J.S.A. 2C:43-6(a)(1), a sentence for a first-degree crime must be between ten and twenty years. Defendant's sentence in the mid-range of these values met this requirement.

Additionally, a reviewing court must ensure that any aggravating or mitigating factors found by the sentencing judge under N.J.S.A. 2C:44-1 are based upon sufficient credible evidence in the record. State v. Miller, 205 N.J.

109, 127 (2011). If the factors found by the sentencing judge are so grounded, the sentence must be affirmed, even if the reviewing court would have reached another result. State v. O'Donnell, 117 N.J. 210, 215 (1989).

On this record, we are satisfied the judge's findings supported applying the cited aggravating factors and diminishing the weight applied to the mitigating factors. The judge found that any one of the several times defendant and others penetrated Sara at the gentleman's club would have been sufficient to satisfy the statutory elements of aggravated sexual assault. The judge cited the numerous and varied sexual acts performed on Sara, and concluded "each additional act of penetration beyond the first justifie[d] a finding of aggravating factor one without the presence of double counting" for counts eleven and thirteen.

The judge also found aggravating factor two applied to counts eleven and thirteen, stating defendant caused "lasting psychological harm to" Sara by sexually assaulting her "multiple times and in multiple ways" while "being assisted by others" and "assisting others or facilitating others in sexually assaulting" her "in full view of the rest."

We discern no error in the judge's application of aggravating factors one and two based on the record. Sara suffered multiple assaults. Any one of those

assaults would have satisfied the elements required for aggravated sexual assault. Given the degree to which Sara suffered multiple violations of her body, which were viewed by others, we disagree with defendant's contention that his conduct was no worse than any of the other acts of aggravated sexual assault.

We also reject defendant's contention that Sara did not suffer significant harm because she could not recall details of the incident. Sara repeatedly expressed distress at the loss of control and lack of memory when testifying. Additionally, even if Sara could not personally recall the events of November 5, 2012, she learned the horrific and upsetting details of that night from the video footage and trial testimony. We are satisfied the judge's application of aggravating factors one and two reflected the overall harm suffered by Sara and the egregious manner and circumstances in which the harm was inflicted.

We also reject defendant's argument that the judge erred in applying aggravating factor three, "the risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), based on his lack of an expression of remorse or guilt. In applying aggravating factor three to all three aggravated sexual assault counts, the judge stated, "offenders who commit serious and violent sex crimes have demonstrated high recidivism" generally. The judge further found defendant's continued assertions that Sara consented to the sex acts and did not

appear intoxicated indicated he was "incapable of discerning when someone is incapacitated." Thus, the judge determined defendant was "at a high risk to reoffend . . . because it's clear from his statements that he lacks insight in this crime."

Contrary to defendant's arguments regarding aggravating factor three, a lack of remorse or denial of responsibility may be considered by a sentencing judge in determining a defendant is likely to commit another offense. State v. Carey, 168 N.J. 413, 427 (2001) (affirming sentence where court found that defendant denied responsibility for car crash or that he had an alcohol problem); O'Donnell, 117 N.J. at 216 (affirming sentence where court considered defendant's lack of remorse and "boastful" attitude regarding the assault); State v. DeRoxtro, 327 N.J. Super. 212, 226 (App. Div. 2000) (affirming sentence where court considered that defendant showed no remorse or anguish over the victim's death). While a defendant's refusal to acknowledge guilt after being convicted is "not a germane factor in the sentencing decision," we have found a judge's consideration of such a refusal does not in itself necessarily warrant resentencing. State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985) (holding that the trial court's brief allusion to failure to admit guilt did not require remand).

Based on the foregoing analysis, we are satisfied the judge did not err in applying aggravating factor three. The judge's application of this factor was not based solely on defendant's failure to admit guilt or express remorse. Rather, the judge cited defendant's continued assertion that Sara consented to the sexual acts and was not intoxicated that evening. The judge explained that the video footage showing Sara falling multiple times, trying to cover her unclothed body, and appearing dazed belied defendant's assertions.

Under these circumstances, the judge reasonably determined defendant was likely to reoffend based not only on his lack of remorse but his patent inability to determine whether a person was incapacitated or consented to sexual activity.

We also reject defendant's arguments regarding the judge's application of aggravating factor four, that "[a] lesser sentence will depreciate the seriousness of the defendant's offense because it involved a breach of the public trust under chapters [twenty-seven] and [thirty] of this title, or the defendant took advantage of a position of trust or confidence to commit the offense." N.J.S.A. 2C:44-1(a)(4). Defendant contends this aggravating factor is applicable to public officials or others in positions of fiduciary trust. Because defendant was simply

a manager at the club where Sara worked, he argued he lacked a position of power or trust over her to find aggravating four applicable.

Contrary to defendant's argument, aggravating factor four is not limited to public officials or fiduciaries. The statute applies where a defendant "took advantage of a position of trust or confidence" in relation to the victim. N.J.S.A. 2C:44-1(a)(4).

In applying aggravating factor four to counts eleven, thirteen, and fourteen, the judge found Sara "trusted defendant would look out for her, assure her pay, [and] drive her home, so she got home safely after a late night of work." Based on Sara's testimony, the judge further found "she did have trust in [defendant] based upon [their] boss/employee relationship," and defendant took "advantage of her trust and her bond to commit these acts against her."

Here, defendant held a managerial position superior to Sara. He scheduled her work shifts, paid her wages, and, occasionally, drove her home. We are satisfied there is sufficient evidence in the record to support the judge's finding that defendant held a position of trust over Sara and took advantage of his position to assault her.

We also reject defendant's argument that the judge erred by applying "great weight" to aggravating factor nine, "the need for deterring the defendant

and others from violating the law." N.J.S.A. 2C:44-1(a)(9). He contends the judge improperly applied this factor based on his lack of remorse, the serious nature of the offense, and the fact that there were multiple counts. He claims sufficient deterrence would result from "the minimum [ten]-year NERA sentence."

Deterrence "has been repeatedly identified in all facets of the criminal justice system as one of the most important factors in sentencing," State v. Megargel, 143 N.J. 484, 501 (1996), and "demands for deterrence are strengthened in direct proportion to the gravity and harmfulness of the offense," State ex rel. C.A.H., 89 N.J. 326, 337 (1982). Aggravating factor nine incorporates both a sentence's general deterrent effect on the public and its personal or specific deterrent effect on an individual defendant. Specific deterrence is deemed more important. State v. Jarbath, 114 N.J. 394, 405 (1989). A lack of remorse may be cited by a sentencing court to justify imposition of aggravating factor nine because such an attitude "indicate[s] that a prison sentence is necessary to deter [a] defendant from similar conduct in the future." State v. Rivers, 252 N.J. Super. 142, 154 (App. Div. 1991).

In applying aggravating factor nine to the aggravated sexual assault counts, the judge found a "great" need for deterrence in this case,

notwithstanding defendant's lack of a prior criminal record, "because of the serious nature of the offenses and because of . . . what appears to be a lack of remorse and consistent denial of wrongdoing."

We are satisfied the crimes of which defendant was found guilty were particularly serious and committed in a particularly heinous manner, creating a need for specific deterrence as to defendant himself. Additionally, general deterrence is applicable here to prevent similar assaults against women in similar circumstances. Thus, we discern no error in the judge's application of aggravating factor nine.

We disagree with defendant's assertion that the judge should have given more weight to mitigating factor seven, "the defendant has no history of prior delinquency or criminal activity," N.J.S.A. 2C:44-1(b)(7), and mitigating factor eleven, "the imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents," N.J.S.A. 2C:44-1(b)(11). He cites letters from colleagues, family, and friends which emphasized defendant's positive attributes and noted he cared for his severely disabled mother.

While the judge applied these mitigating factors, she accorded little weight to mitigating factor seven and "significant weight" to mitigating factor

73

eleven. However, overall, the judge found the mitigating factors did not "outweigh the severity of the heinous acts committed by" defendant.

Again, we are satisfied the judge did not err in applying and weighing these mitigating factors. The judge gave great weight to the hardship imposed on defendant's family in applying mitigating factor eleven. She also considered defendant's lack of a prior record and noted this was his first offense. However, the judge properly found the seriousness of the offenses outweighed the lack of a prior criminal history.

On this record, the judge properly concluded the aggravating factors "substantially outweigh[ed]" the mitigating factors. Additionally, the sentences imposed for each of the three aggravated sexual assault charges were within the statutory range for first-degree crimes. Based on sufficient evidence in the record, we discern no abuse of discretion in the judge's application of the aggravating and mitigating factors.

We also reject defendant's argument that the judge improperly imposed consecutive sentences for counts eleven and thirteen. Defendant contends his multiple assaults of Sara constituted "a continuous event, and therefore, a single period of aberrant behavior." Thus, he contends the sentences should have been run concurrently.

74

Defendant was tried alongside co-defendant Lozada. In a separate appeal from her convictions and sentence, Lozada argued the judge "erred in imposing consecutive sentences . . . because the sexual assaults charged under all counts was part of one ongoing criminal episode, requiring concurrent sentences . . . ." Lozada, No. A-3211-20, slip op. at 7. There, we agreed the imposition of consecutive sentences for Lozada was improper, concluding the crimes committed at the bar and in the champagne room at the gentlemen's club "were separated only by a brief period of time (approximately thirty minutes) and distance (about fifteen feet), and to the number of victims (one)" and, thus, "the circumstances precluded imposition of consecutive prison terms . . . ." Id. at 17.

Here, defendant raises the same argument. However, the facts regarding defendant's sexual assaults of Sara are different. Defendant assaulted Sara in the bar, in the champagne room, and, hours later, in the apartment. During sentencing, the judge explained "the abuse in this case last[ed] for many hours" and occurred in different and distinct locations. The judge stated Sara "suffered separate and distinct insults to her dignity" by defendant, and defendant's role in the events of that evening were not one continuous episode, unlike Lozada's role in the events that night.

Here, there was sufficient time between the sexual assaults in the gentleman's club and the apartment for defendant to have reflected on his actions and elect not to assault Sara in the apartment. Further, defendant knew Sara was in distress when he heard her yelling about De La Cruz in the apartment. At that point, defendant no doubt knew Sara suffered further sexual assaults in the apartment. Rather than offer Sara comfort and a ride home at that point, defendant chose to sexually assault her, notwithstanding his claim they engaged in "consensual sex" while in the apartment.

When the imposition of consecutive terms is challenged, we must ensure that the principles set forth in Yarbough were correctly applied. The Yarbough factors provide:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence shall be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;
> >
> > (b) the crimes involved separate acts of violence or threats of violence;

76

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous.

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .

[State v. Yarbough, 100 N.J. 627, 643-44 (1985).]

A sentencing court must consider all of the Yarbough factors, with emphasis on the subparts under the third factor. State v. Rogers, 124 N.J. 113, 121 (1991). The factors must be applied qualitatively, not quantitatively, and consecutive sentences may be imposed even when a majority of the subparts support concurrent sentences. Carey, 168 N.J. at 427.

If a sentencing court fully evaluates the Yarbough factors, its decision will not usually be disturbed on appeal. Miller, 205 N.J. at 129. However, remand may be needed if a court does not sufficiently explain why consecutive sentences are warranted. Ibid. Additionally, "the sentencing court's explanation of its

evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'" Torres, 246 N.J. at 270 (quoting State v. Cuff, 239 N.J. 321, 239 (2019)). Nevertheless, remand is unnecessary if the record "makes it possible to 'readily deduce' the judge's reasoning." Miller, 205 N.J. at 129 (quoting State v. Bienek, 200 N.J. 601, 609 (2010)).

Having reviewed the sentencing transcript, we are satisfied the sentencing judge properly considered the Yarbough factors in determining whether to impose consecutive or concurrent sentences. The judge ordered defendant's prison term on counts eleven and thirteen to run consecutively because those counts involved different crimes, occurring at different places, and at different times, although involving the same victim. Unlike the events for which Lozada was sentenced, defendant assaulted Sara in a third location, well after she dressed and left the gentlemen's club. Moreover, because defendant received a mid-range sentence on counts eleven and thirteen, consecutive terms on those counts did not result in an aggregate sentence that "shock[ed] the judicial conscience." O'Donnell, 117 N.J. at 216.

However, we agree the matter warrants a remand for the sentencing judge to explain why the overall length of the sentence is warranted under Torres. 246 N.J. at 270. On remand, the sentencing judge shall provide an explicit statement

regarding the fairness of the overall length of defendant's prison sentence consistent with Torres. We take no position on the sentencing judge's disposition of this issue on remand.

We turn to defendant's argument that the sentencing judge failed to provide a statement of reasons supporting the $6,000 SCVTF penalty under N.J.S.A. 2C:14-10. Under the statute, a person convicted of a sex offense "shall be assessed a penalty for each such offense not to exceed," in the case of a first-degree crime, $2,000. N.J.S.A. 2C:14-10(a)(1). The assessment of a penalty for each offense is "mandatory." State v. Bolvito, 217 N.J. 221, 224 (1994).

However, the SCVTF penalty need not be the maximum statutory amount. "[A] sentencing court may impose an SCVTF penalty against a defendant in any amount between a nominal figure and the upper limit prescribed by N.J.S.A. 2C:14-10(a) for the degree of the offense at issue." Ibid. When deciding the amount of an SCVTF penalty, the court must "consider the nature of the offense, as well as the defendant's ability to pay the penalty during any custodial sentence imposed and after his or her release." Ibid. The sentencing court "should provide a statement of reasons when it sets a defendant's SCVTF penalty within the statutory parameters." Id. at 235.

Here, defendant was convicted of three first-degree sex crimes, so $6,000 was the maximum penalty which could be assessed. At sentencing, the judge stated she "ha[d] to impose a penalty of the Sex Crime Treatment Fund" and "because [there were] three offenses it's $2,000 on each count for a total of $6,000," absent a further statement of reasons. On appeal, the State does not dispute a remand is necessary regarding the sentencing judge's assessment of the SCVTF penalty. Thus, we remand to the trial court to set forth reasons in support of the amount of the penalty levied. We take no position on the sentencing judge's disposition of this issue on remand.

Affirmed in part and remanded in part for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION